| .DALEY, J.
The defendant, Otis J. Dereyna, has appealed his convictions of possession with intent to distribute narcotics. Mr. Derey-na was charged by a three-count Bill of Information. Count one charged him with *217 possession with intent to distribute a controlled dangerous substance, 3, A-methy-lenedioxy-methamphetamine (MDMA),[1] in violation of LSA-R.S. 40:966 A; count two charged him with possession with intent to distribute a controlled dangerous substance, Hydrocodone,[2] in violation of LSA-R.S. 40:967 A, and count three charged him with possession of a controlled dangerous substance, cocaine[3] over 400 grams, in violation of LSA-R.S. 40:967 F. On count three, the original charge of possession of cocaine over 400 grams, was later amended Uto reduce the amount to over 200 grams but not over 400 grams. Defendant entered a plea of not guilty, and filed a Motion to Suppress the Evidence. Following the denial of the motion, defendant withdrew his former plea and entered a plea of guilty as charged on all counts, as amended. He reserved his right under State v. Crosby, 338 So.2d 584 (La.1976) to appeal the denial of the Motion to Suppress. On appeal, defendant assigns as error the trial judge’s denial of his Motion to Suppress the evidence.

FACTS

At the Motion to Suppress hearing, Agent Donald DeSalvo testified he is employed by the Jefferson Parish Sheriffs Office to work at the airport’s narcotics unit. On December 9, 1996, he received a telephone call from Agent Todd Vignes, a member of the Jefferson Parish Sheriffs Narcotics Division. Agent Vignes informed Agent DeSalvo that he (Agent Vignes) received information from a reliable confidential informant that a suspect was bringing illegal narcotics, specifically cocaine, to and from Miami. The informant told Agent Vignes the suspect’s first name was “Otis.” The suspect was described as a “very large” white male, with short black hair, who was six feet and seven inches in height, and weighed approximately three hundred pounds. The suspect was traveling to and from Miami, and would be coming into New Orleans in the next few days after having picked up illegal narcotics.
Agent DeSalvo began to monitor all of the Miami flights. In doing so, he and his partner observed a subject departing from a Miami flight who fit the suspect’s description “to a tee.”
| ¿Agent DeSalvo, who identified defendant in court as the suspect, stated that defendant, walked past him, looking “nervous.” In his experience as a narcotics agent, he has observed that people who exit a flight carrying illegal substances are frequently “extremely nervous.” Based on the suspects appearance and his behavior Agent DeSalvo and his partner began to maintain surveillance on defendant.
Defendant proceeded to walk to the main lobby, while looking back several times. Defendant gave the appearance that he was looking back to see if he was being followed. As defendant approached the escalator leading to the baggage area, he came to a complete stop in the lobby, turned around, and scanned the area for approximately ten seconds. The agents walked past defendant in order to avoid detection. The defendant then walked toward the pay telephones. He stood near the cluster of telephones, sat there, and constantly looked around throughout the airport. Agent DeSalvo described the defendant as acting “very very nervous” and looking “scared.”
Defendant left the telephone location and walked downstairs toward the baggage claim areá. He waited one or two minutes, then picked up two bags which had been placed on the conveyor belt. After he picked up the bags, the two agents *218 approached the defendant, identifying themselves as police officers. They asked him if they “could speak to him for a second.” When defendant was first approached, he had the bags in his hands. However, when the agents walked up to him, defendant put them down, and walked several feet away from the bags. Accordingly to Agent DeSalvo the defendant appeared to be distancing himself from the baggage. Based on Agent DeSalvo’s experience in working at the airport, a number of people with illegal contents in their baggage will try to distance themselves from the baggage.
| ¡Agent DeSalvo testified that when he asked to speak to defendant, defendant replied, “Yeah. What’s the problem?” Agent DeSalvo responded, “We’re police officers here at the airport. We’re investigating a complaint.” The agent asked defendant if he had an airline ticket on him. Defendant produced a cash round trip ticket, originating from New Orleans, and indicating his first name was “Otis.” At the officers’ request, the defendant produced identification, matching the name on the airline ticket. Agent DeSalvo told defendant that he. had information that someone matching his description and having his first name was going to be carrying illegal narcotics from Miami to New Orleans. He asked defendant if he was carrying illegal narcotics and defendant replied negatively.
Agent DeSalvo stated that when he first approached defendant, and informed him he was a police officer, as well as mentioning “narcotics agent,” defendant’s face whitened and he seemed “almost desperate” as well as “nervous.” Agent DeSalvo and his partner were “a little nervous” as well, considering defendant’s size. At that time the agents did not know whether defendant had any weapons on him.
After defendant replied negatively regarding the carrying of any illegal drugs, Agent DeSalvo asked defendant for permission to search his bags. Defendant replied he did not have narcotics in his bags. The agent viewed that response as a denial of his request for permission to search the bags.
Agent DeSalvo next asked defendant if he had a weapon on his person. Defendant replied negatively. After receiving that reply, the agent then asked, “Do you mind if I just pat you down?” Agent DeSalvo testified that he requested the pat-down because he was concerned for his safety, and he wanted to be certain defendant was not carrying anything which would hurt him.
lfiAs Agent DeSalvo patted defendant down, he felt a large bulge in defendant’s front pocket. Agent DeSalvo testified that he was “definitely” concerned for his safety. However, he had no idea what the soft bulge could have been, but had reason to believe it could have been a weapon. He explained that on several occasions he has recovered weapons which were wrapped inside a soft bulge. The technique of wrapping weapons in a soft bulge was especially true of individuals who were stopped at the airport. These individuals believe that they can conceal these items by wrapping them in handkerchiefs, or big bulky material which will escape detection.
At this point, he asked the defendant to identify the bulge. Agent DeSalvo testified that defendant “really seemed nervous” and stated, “Hey, it’s nothing, it’s just some aspirin.” Agent DeSalvo asked to see the bulge. The defendant pulled out the object far enough out of his pocket so that the agent could determine the nature of the object. Agent DeSalvo testified that he saw a plastic ziplock bag with the number “1,000” written on it. The bag contained several other bags, each of which" contained large white pills which did not look like aspirin. Agent DeSalvo testified that from his experience in illegal narcotics, he knew the pills would probably be illegal narcotics.
At that point, Agent DeSalvo testified that he told the defendant that he was going to be detained and gave the defendant his rights. Agent DeSalvo then *219 walked defendant to the office which was a short distance away.
After Agent DeSalvo determined the pills were “Ecstasy,” he applied for a warrant to search the defendant’s bags. Prior to obtaining the warrant, a narcotics dog was brought in to determine if the animal could detect the odor of narcotics in the defendant’s bags. The dog became so excited, it bit a hole in the bag. After obtaining the search warrant, the bags were opened. A bag filled with tablets labeled 17“Vicodin”[4] tablets was wrapped inside the clothing in the bag. The agents also found a plastic package containing “white hard-like powder,” encased in layers of fabric softener which was' later identified as cocaine.
Agent DeSalvo, testified that it was “very common” to use fabric softener as an attempt to conceal the odor from narcotics dogs. He testified that the agents also found documents described as drug ledgers on defendant’s person.
On cross-examination, Agent DeSalvo testified that although it would not be unusual for someone exiting an airplane for the first time to exhibit defendant’s nervous behavior, he explained that he watches people exit airplanes all day, and the defendant’s behavior was “definitely different” from other passengers he had observed. Agent DeSalvo testified that at the time he first started speaking with the defendant, the defendant was free to leave. He described the initial encounter as one in which he was not asking the defendant to remain for questioning, but rather was only asking to speak to him for “a second.” he described the exchange as follqws:
I said, “how you doing? I’m a police officer working at the airport and I’d like to speak to you for a second.” He said, “Sure. No problem.”
Agent DeSalvo felt that it was only at the end of his initial conversation with defendant, after the white pills were discovered in the defendant’s pocket, that a custodial interrogation began. It was at that point that the agent gave defendant his Miranda rights.
When questioned as to why he found it necessary to conduct a pat-down on the defendant, in light of the fact that the defendant had to walk through a metal detector prior to boarding the plane and was under constant surveillance once he exited the plane, Agent DeSalvo explained:
|s... trust me, it’s not that difficult to-you can carry a knife on the plane, they’re not going to tell you anything about that. I stop people with knives all the time. Unless it’s a certain type of knife, a big knife or-you just have to tell them what it is and they let you carry it in your pocket.
Furthermore, Agent DeSalvo testified that he has recovered several weapons from people who had wrapped the weapon in a “soft bulge.”
The application/affidavit for a search warrant, executed by Agent DeSalvo was introduced as part of State’s Exhibit No. 1. The affidavit mirrors the testimony given by Agent DeSalvo at the suppression hearing.
The defendant took the stand and testified that on December 9, 1996, he arrived at New Orleans’ International Airport on a flight from Miami. He was the last person to leave the airplane, and was expecting someone to meet him in the corridor area or at the baggage terminal. This person was not present when he arrived. The defendant testified that he walked toward the baggage terminal, stopping to make a telephone call. He learned his party was running late, but was on his way to the airport, and should arrive in ten to fifteen minutes. He went to the baggage claim area, and when he grabbed his bags and turned to walk out, he saw the agents approaching him. Both agents pulled out their wallets, and Agent DeSalvo started to speak to him.
*220 The defendant testified that Agent DeS-alvo said he was a narcotics officer, and stated, “I want to speak to you for a minute The defendant testified that he replied, “Sure. What’s the problem?” The agent explained that he had been monitoring the airport and he had evidence that the defendant' was trafficking narcotics. He asked to check defendant’s bags. Defendant denied the request.
The defendant testified that at this point he did not feel he could stop the conversation and walk away. He felt that once the agents inquired about narcotics J^and asked to check his bags there was no way he was going to walk away from these two men, and if he did walk away, he would be detained by other men.
The defendant testified that he complied when Agent DeSalvo asked him to produce a ticket and identification. The ticket was in his name and matched his identification. He further testified that he has no major credit cards, and always pays for such transportation with cash. The defendant told the agent he went to Miami to search for land for daiquiri shops.
The defendant testified that he replied negatively when Agent DeSalvo asked if he had any narcotics on him. Agent DeS-alvo asked him if he could pat him down in order to check him for weapons. He told the defendant he was doing it for his own safety. The defendant told the agent he had no weapons on him and that he did not want the agent to pat him down.
The defendant testified that during the pat-down, the agent located a bulge in his left front pocket. The agent grabbed it and said, “What is that?” Defendant responded, “It’s nothing, it’s aspirins.” The defendant denied that he pulled out the bulge, stating that the agent pulled it out.

DISCUSSION:

On appeal, the defendant asserts the trial judge erred in denying his Motion to Suppress the evidence seized at the time of his arrest. At the time of the arrest, the following evidence was seized: (1) Ecstasy tablets were recovered from defendant’s pocket after the pat down; and (2) tablets labeled, “Vicodin,” and a bag containing a white powder were found in the search of the suitcase, pursuant to a search warrant.
The defendant first argues on appeal that he was illegally detained and not free to leave when the agents first questioned him in the airport. According to defendant, Imthe agents lacked a sufficient basis for detaining defendant since the only information they had at the time was that he arrived on a flight from Miami and matched the description given by the informant. Defendant argues that any evidence obtained pursuant to the illegal detention should have been suppressed. The defendant’s second argument is that the package of pills found in his pocket was illegally seized pursuant to an unlawful pat down and search.
The dispositive issue in this case is whether or not the package of pills which was in the defendant’s pocket was illegally seized. If the pills were legally seized they create probable cause for the warrant and resulting seizure of Vicodin and cocaine. Since the seizure of these pills resulted from a warrantless search, the state has the burden of proof. State v. McHugh, 92-1852, pp. 4, 5 (La.1/6/94), 630 So.2d 1259, 1262. See also LSA-C.Cr.P. art. 703 D. The defendant challenges the constitutionality, first of the initial investigative questioning by Agent DeSalvo, and second, the constitutionality of the pat down search and resulting seizure of the pills.
In Terry the U.S. Supreme Court set the guidelines for certain police laymen interaction:
... not all personal intercourse between policemen and citizens involves “seizures” of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a “seizure” has occurred.
*221 Terry v. Ohio, 392 U.S. 1 at 19, n. 16, 88 S.Ct. 1868 at 1879, n. 16, 20 L.Ed.2d 889 (1968).
The requirements for a valid stop pursuant to Terry, and for a search incident to that stop has been codified in Louisiana Code of Criminal Procedure article 215.1, which provides in pertinent part:
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may In demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.
In State v. Lassere, 95-1009, pp. 8, 9 (La.App. 5 Cir. 10/1/96), 683 So.2d 812, 818, writ denied, 96-2655 (La.4/18/97), 692 So.2d 445, this court articulated:
The question of whether a particular search or seizure is reasonable is for the trier of fact. It is well settled that a trial court’s factual determinations are entitled to great weight on appellate review. Accordingly, a trial court’s decision to deny a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression.
Furthermore, this court has held that “[w]hen the trial court is presented with conflicting testimony, the credibility of the witnesses is a matter within the sound discretion of the trier of fact and will not be disturbed on review unless clearly contrary to the evidence.” State v. Gibson, 97-1203, p. 10 (La.App. 5 Cir. 3/25/98), 708 So.2d 1276, 1281.
We find the agents had a right under Terry and Article 215.1 A to approach and question defendant, who exhibited suspicious scanning and nervous behaviors, and accurately fit the detailed description of a drug courier given by the reliable informant. Under these circumstances there was reasonable, articulable suspicion that defendant was engaged in criminal activity. Moreover, defendant’s testimony reveals that during the initial investigatory stop, the agents did not use physical force nor úse a show of authority to restrain his liberty. See Terry v. Ohio, 392 U.S. at 19, n. 16, 88 S.Ct. at 1879, n. 16. The defendant’s speculation that he would be restrained by other officers, if he did not cooperate, was not supported by any evidence. Thus, we conclude based on the evidence, that it was only when defendant was escorted by the officers to the narcotics room that a seizure occurred, since at that point, his liberty was restrained.
Concerning a pat down search, in Terry, the Court further held:
... where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others’ safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an *222 attempt to discover weapons which might be used to assault him.
392 U.S. at 30, 88 S.Ct. at 1884, 1885.
Louisiana courts have likewise interpreted La. Code of Criminal Procedure Article 215.1 to allow police officers to frisk a criminal suspect when the police officer can articulate a factual basis for his fear of danger. In State v. Denis, 96-0956 (La.App. 4 Cir. 3/19/97), 691 So.2d 1295, the court stated:
We recognize that the police have the right to ensure their,own safety in an encounter with a suspected criminal. Under both our federal and state Constitutions, however, this right must be balanced against an individual citizen’s right to be free from unreasonable searches. Although sometimes appearing to be a legal .technicality, Article '215.1 B represents the legislature’s attempt to maintain that balance by allowing an officer, who has lawfully stopped an individual, to perform a pat-down for weapons, but only if he “reasonably suspects that he is in danger.”
# # ;J; # ;j:
Unless the plain language of Article 215.1 B is interpreted as authorizing an officer to frisk every pedestrian who is stopped pursuant to subsection A, the only way a court can determine if the officer reasonably suspected that he was in danger is to require him to express that suspicion, and explain upon what it is based.- Eliminating the requirement | T of or such articulation not only eviscerates this statute, but also opens the door for potential abuse by the rare officer who acts upon personal prejudices rather than actual observation and experience.
The defendant argues it was unreasonable for the agent to believe the defendant had a weapon because he had to pass through a metal detector in the Miami airport prior to boarding the plane. The defendant asserts the pat-down of defendant’s clothing was only a pretext to gain access to other things.
Agent DeSalvo explained that despite the protective measures used at airports, individuals are allowed to carry certain types of knives. According to Agent DeS-alvo, when he mentioned he was a police officer and narcotics agent, defendant’s face whitened and he seemed desperate. Both agents were “a little nervous” considering defendant’s size. Concerned for his safety, Agent DeSalvo asked defendant if he would consent to being patted down. Considering there was a potential for defendant to be carrying a knife, defendant’s size, along with his description matching that of the alleged drug dealer, and defendant’s unusual scanning and nervous behavior, we conclude Agent DeSalvo articulated a reasonable basis for fear of his safety and was justified in conducting a limited search of defendant’s outer clothing.
The defendant further argues that the seizure of the package in his pocket lacked justification under the “plain-feel” exception enunciated in Minnesota v. Dickerson, 508 U.S. 366, 375, 376, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334 (1993). The Dickerson court held that in order to justify a seizure of an object under the “plain-feel” exception, “ the incriminating character of the object would have to be immediately apparent to the officer and not subjected to any additional form of search or examination to identify it as contraband, and the pat down itself would have to be based upon reasonable suspicion that the person was armed.” Dickerson, 508 U.S. at 378-9, 113 S.Ct. at 2139. The defendant specifically argues the tactile sensation of the bulging object in his pocket, did not make the incriminating character of the object “immediately apparent.” He asserts it was only after an additional form of search that the nature of its contents became apparent.
Agent DeSalvo testified he became “definitely” concerned for his safety after feeling the large, soft bulge in defendant’s *223 pocket, which he believed, under the circumstances, could conceal a knife. The agent next asked the defendant what was in his pocket. The defendant responded “it’s nothing, it’s just some aspirin”. The agent testified that the defendant next pulled a portion of the bag from his pocket and showed him it contained white pills. Agent DeSalvo determined the pills did not look like aspirin and suspected they were illegal narcotics. Once the pills were visible to the agent the plain feel restrictions of Minnesota v. Dickerson are not applicable and plain view case law applies. The agent after seeing in plain view suspected narcotic can seize the pills for further investigation. The trial judge in his reasons for denying the Motion to Suppress found that, “the pat down was part of the interrogation and of course then when the “Ecstacy” tablets were produced it was probable cause then to proceed...”
We acknowledge that the defendant testified that he did not show the white pills, the Ecstasy pills, in his pocket to the agent, but we have concluded that the trial judge believed the agent. Having determined the pills were voluntarily exhibited by the defendant their seizure was not unconstitutional under these circumstances.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990); and State v. Godejohn, 425 So.2d 750 (La.1983). Two errors patent noted must be addressed by this Court. First, there is an inconsistency between |1Rthe commitment/minute entry and the transcript regarding the sentence for count two, and second, the trial judge failed to accurately inform defendant of the prescriptive period for filing post conviction relief.
Defendant was sentenced to five years at hard labor on count one; two and one-half years at hard labor on count two; and twenty years at hard labor and a fine of $100,000.00 on count three. Code of Criminal Procedure article 871 A requires the sentence to be recorded in the minutes of the court. The recorded commitment/minute entry is inconsistent with the transcript insofar as noting the sentence imposed for count two, possession with intent to distribute Hydrocodone. According to the transcript, the trial judge sentenced defendant to two and one-half years at hard labor for count two. In contrast, the commitmeni/minute entry reflects defendant was sentenced to five years at hard labor for this count.
In State v. Lynch, 441 So.2d 732, 734 (La.1983), the Supreme Court held that when “there is a discrepancy between the minutes and the transcript, the transcript must prevail.” Therefore, we amend the minute entry and commitment to conform to the 2lh year sentence imposed by the trial judge on count two.
The record reflects that at sentencing, the trial judge failed to properly advise defendant of the prescriptive period for post conviction relief as required by LSA-C.Cr.P. art. 930.8. During the plea colloquy, the trial judge informed defendant that he had three years to file for post conviction relief “from the date the sentence is imposed.” Defendant’s Waiver of Rights form recites only that he has three years in which to file, but gives no indication as to the beginning of the time period. Thus, the record reveals the trial judge failed to accurately advise defendant of the beginning date for the prescriptive period.
|1fiAn amendment to Article 930.8, which became effective on August 15,1999, shortens the prescriptive period from three years to two years. See 1999 La. Acts 1262. The amended article provides, in pertinent part:
A. No application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of *224 conviction and sentence has become final under the provisions of Article 914 or 922, unless any of the following apply:
‡ H* % # ‡
(3) The application would already be barred by the provisions of this Article, but the application is filed on or before October 1, 2001, and the date on which the application was filed is within three years after the judgment of conviction and sentence has become final.
The application of the amended prescriptive period in defendant’s case would not violate ex post facto prohibitions, as the article itself does not relate to an offense or its punishment. See State ex rel. Glover v. State, 93-2330, 94-2101, 94-2197 (La.9/5/95), 660 So.2d 1189, 1201. Therefore, we hereby order the district court to send written notice of the amended prescriptive period (along with an advi-sal of when the period begins to run) to defendant within ten days of the rendering of this opinion, then to file written proof in the record that defendant received said notice. State v. Stelly, 98-578 (La.App. 5 Cir. 12/16/98), 725 So.2d 562.
Accordingly, the defendant’s conviction is affirmed. The minute entry and commitment are amended to reflect the two and one-half years sentence imposed on count two.
CONVICTION AFFIRMED; SENTENCE AFFIRMED; CASE REMANDED.

. MDMA is a schedule I controlled dangerous substance. See LSA-R.S. 40:966 A(l) and Schedule I, LSA-R.S. 40:964 C(23).

. Hydrocodone is a schedule II controlled dangerous substance. See LSA-R.S. 40:967 A(l) and Schedule II, LSA-R.S. 40:964 A(l)(k).

.Cocaine is a schedule II controlled dangerous substance. See LSA-R.S. 40:967 A(l) and Schedule II, LSA-R.S. 40:964 A(l)(4).

. This drug is also known as Hydrocodone.