# MINNESOTA *v.* DICKERSON

No. 91–2019.   Argued March 3, 1993—Decided June 7, 1993

*Michael O. Freeman* argued the cause for petitioner. With him on the briefs were *Hubert H. Humphrey III*, Attorney General of Minnesota, *Patrick C. Diamond*, and *Beverly J. Wolfe*.

*Richard H. Seamon* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson*, and *Kathleen A. Felton*.

*Peter W. Gorman* argued the cause for respondent. With him on the brief were *William R. Kennedy, David H. Knutson, Warren R. Sagstuen*, and *Renée J. Bergeron*.*

JUSTICE WHITE delivered the opinion of the Court.

In this case, we consider whether the Fourth Amendment permits the seizure of contraband detected through a police officer's sense of touch during a protective patdown search.

## I

On the evening of November 9, 1989, two Minneapolis police officers were patrolling an area on the city's north side in a marked squad car. At about 8:15 p.m., one of the officers observed respondent leaving a 12-unit apartment building on Morgan Avenue North. The officer, having previously responded to complaints of drug sales in the building's hallways and having executed several search warrants on the premises, considered the building to be a notorious "crack house." According to testimony credited by the trial court, respondent began walking toward the police but, upon spot-

---

*\*Fred E. Inbau, Wayne W. Schmidt, James P. Manak*, and *Robert H. Macy* filed a brief for Americans for Effective Law Enforcement, Inc., et al. urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *John F. Savarese, Steven R. Shapiro*, and *Deborah Gilman;* and for the National Association of Criminal Defense Lawyers by *David M. Eldridge*.

ting the squad car and making eye contact with one of the officers, abruptly halted and began walking in the opposite direction. His suspicion aroused, this officer watched as respondent turned and entered an alley on the other side of the apartment building. Based upon respondent's seemingly evasive actions and the fact that he had just left a building known for cocaine traffic, the officers decided to stop respondent and investigate further.

The officers pulled their squad car into the alley and ordered respondent to stop and submit to a patdown search. The search revealed no weapons, but the officer conducting the search did take an interest in a small lump in respondent's nylon jacket. The officer later testified:

> "[A]s I pat-searched the front of his body, I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane." Tr. 9 (Feb. 20, 1990).

The officer then reached into respondent's pocket and retrieved a small plastic bag containing one fifth of one gram of crack cocaine. Respondent was arrested and charged in Hennepin County District Court with possession of a controlled substance.

Before trial, respondent moved to suppress the cocaine. The trial court first concluded that the officers were justified under *Terry* v. *Ohio,* 392 U. S. 1 (1968), in stopping respondent to investigate whether he might be engaged in criminal activity. The court further found that the officers were justified in frisking respondent to ensure that he was not carrying a weapon. Finally, analogizing to the "plain-view" doctrine, under which officers may make a warrantless seizure of contraband found in plain view during a lawful search for other items, the trial court ruled that the officers' seizure of the cocaine did not violate the Fourth Amendment:

> "To this Court there is no distinction as to which sensory perception the officer uses to conclude that the ma-

terial is contraband. An experienced officer may rely upon his sense of smell in DWI stops or in recognizing the smell of burning marijuana in an automobile. The sound of a shotgun being racked would clearly support certain reactions by an officer. The sense of touch, grounded in experience and training, is as reliable as perceptions drawn from other senses. 'Plain feel,' therefore, is no different than plain view and will equally support the seizure here." App. to Pet. for Cert. C–5.

His suppression motion having failed, respondent proceeded to trial and was found guilty.

On appeal, the Minnesota Court of Appeals reversed. The court agreed with the trial court that the investigative stop and protective patdown search of respondent were lawful under *Terry* because the officers had a reasonable belief based on specific and articulable facts that respondent was engaged in criminal behavior and that he might be armed and dangerous. The court concluded, however, that the officers had overstepped the bounds allowed by *Terry* in seizing the cocaine. In doing so, the Court of Appeals "decline[d] to adopt the plain feel exception" to the warrant requirement. 469 N. W. 2d 462, 466 (1991).

The Minnesota Supreme Court affirmed. Like the Court of Appeals, the State Supreme Court held that both the stop and the frisk of respondent were valid under *Terry*, but found the seizure of the cocaine to be unconstitutional. The court expressly refused "to extend the plain view doctrine to the sense of touch" on the grounds that "the sense of touch is inherently less immediate and less reliable than the sense of sight" and that "the sense of touch is far more intrusive into the personal privacy that is at the core of the [F]ourth [A]mendment." 481 N. W. 2d 840, 845 (1992). The court thus appeared to adopt a categorical rule barring the seizure of any contraband detected by an officer through the sense of touch during a patdown search for weapons. The court further noted that "[e]ven if we recognized a 'plain feel' ex-

ception, the search in this case would not qualify" because "[t]he pat search of the defendant went far beyond what is permissible under *Terry*." *Id.*, at 843, 844, n. 1. As the State Supreme Court read the record, the officer conducting the search ascertained that the lump in respondent's jacket was contraband only after probing and investigating what he certainly knew was not a weapon. See *id.*, at 844.

We granted certiorari, 506 U. S. 814 (1992), to resolve a conflict among the state and federal courts over whether contraband detected through the sense of touch during a patdown search may be admitted into evidence.[1] We now affirm.[2]

---

[1] Most state and federal courts have recognized a so-called "plain-feel" or "plain-touch" corollary to the plain-view doctrine. See *United States* v. *Coleman*, 969 F. 2d 126, 132 (CA5 1992); *United States* v. *Salazar*, 945 F. 2d 47, 51 (CA2 1991), cert. denied, 504 U. S. 923 (1992); *United States* v. *Buchannon*, 878 F. 2d 1065, 1067 (CA8 1989); *United States* v. *Williams*, 262 U. S. App. D. C. 112, 119–124, 822 F. 2d 1174, 1181–1186 (1987); *United States* v. *Norman*, 701 F. 2d 295, 297 (CA4), cert. denied, 464 U. S. 820 (1983); *People* v. *Chavers*, 33 Cal. 3d 462, 471–473, 658 P. 2d 96, 102–104 (1983); *Dickerson* v. *State*, No. 228, 1993 Del. LEXIS 12, *3–*4 (Jan. 26, 1993); *State* v. *Guy*, 172 Wis. 2d 86, 101–102, 492 N. W. 2d 311, 317–318 (1992). Some state courts, however, like the Minnesota court in this case, have rejected such a corollary. See *People* v. *Diaz*, 81 N. Y. 2d 106, 612 N. E. 2d 298 (1993); *State* v. *Collins*, 139 Ariz. 434, 435–438, 679 P. 2d 80, 81–84 (Ct. App. 1983); *People* v. *McCarty*, 11 Ill. App. 3d 421, 422, 296 N. E. 2d 862, 863 (1973); *State* v. *Rhodes*, 788 P. 2d 1380, 1381 (Okla. Crim. App. 1990); *State* v. *Broadnax*, 98 Wash. 2d 289, 296–301, 654 P. 2d 96, 101–103 (1982); cf. *Commonwealth* v. *Marconi*, 408 Pa. Super. 601, 611–615, and n. 17, 597 A. 2d 616, 621–623, and n. 17 (1991), appeal denied, 531 Pa. 638, 611 A. 2d 711 (1992).

[2] Before reaching the merits of the Fourth Amendment issue, we must address respondent's contention that the case is moot. After respondent was found guilty of the drug possession charge, the trial court sentenced respondent under a diversionary sentencing statute to a 2-year period of probation. As allowed by the diversionary scheme, no judgment of conviction was entered and, upon respondent's successful completion of probation, the original charges were dismissed. See Minn. Stat. § 152.18 (1992). Respondent argues that the case has been rendered moot by the dismissal of the original criminal charges. We often have observed, however, that

## II

### A

The Fourth Amendment, made applicable to the States by way of the Fourteenth Amendment, *Mapp* v. *Ohio*, 367 U. S. 643 (1961), guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Time and again, this Court has observed that searches and seizures " 'conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.' " *Thompson* v. *Louisiana*, 469 U. S. 17, 19–20 (1984) *(per curiam)* (quoting *Katz* v. *United States*, 389 U. S. 347, 357 (1967) (footnotes omitted)); *Mincey* v. *Arizona*, 437 U. S. 385, 390 (1978); see also *United States* v. *Place*, 462 U. S. 696, 701 (1983). One such exception was

---

"the possibility of a criminal defendant's suffering 'collateral legal consequences' from a sentence already served" precludes a finding of mootness. *Pennsylvania* v. *Mimms*, 434 U. S. 106, 108, n. 3 (1977) *(per curiam);* see also *Evitts* v. *Lucey*, 469 U. S. 387, 391, n. 4 (1985); *Sibron* v. *New York*, 392 U. S. 40, 53–58 (1968). In this case, Minnesota law provides that the proceeding which culminated in finding respondent guilty "shall not be deemed a conviction for purposes of disqualifications or disabilities imposed by law upon conviction of a crime or for any other purpose." Minn. Stat. § 152.18 (1992). The statute also provides, however, that a nonpublic record of the charges dismissed pursuant to the statute "shall be retained by the department of public safety for the purpose of use by the courts in determining the merits of subsequent proceedings" against the respondent. *Ibid.* Construing this provision, the Minnesota Supreme Court has held that "[t]he statute contemplates use of the record should [a] defendant have 'future difficulties with the law.' " *State* v. *Goodrich*, 256 N. W. 2d 506, 512 (1977). Moreover, the Court of Appeals for the Eighth Circuit has held that a diversionary disposition under § 152.18 may be included in calculating a defendant's criminal history category in the event of a subsequent federal conviction. *United States* v. *Frank*, 932 F. 2d 700, 701 (1991). Thus, we must conclude that reinstatement of the record of the charges against respondent would carry collateral legal consequences and that, therefore, a live controversy remains.

recognized in *Terry* v. *Ohio*, 392 U. S. 1 (1968), which held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ," the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions. *Id.*, at 30; see also *Adams* v. *Williams*, 407 U. S. 143, 145–146 (1972).

*Terry* further held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." 392 U. S., at 24. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams, supra,* at 146. Rather, a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Terry, supra,* at 26; see also *Michigan* v. *Long*, 463 U. S. 1032, 1049, and 1052, n. 16 (1983); *Ybarra* v. *Illinois*, 444 U. S. 85, 93–94 (1979). If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed. *Sibron* v. *New York*, 392 U. S. 40, 65–66 (1968).

These principles were settled 25 years ago when, on the same day, the Court announced its decisions in *Terry* and *Sibron.* The question presented today is whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry.* We think the answer is clearly that they may, so long as the officers' search stays within the bounds marked by *Terry.*

B

We have already held that police officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a *Terry* search. In *Michigan* v. *Long, supra,* for example, police approached a man who had driven his car into a ditch and who appeared to be under the influence of some intoxicant. As the man moved to reenter the car from the roadside, police spotted a knife on the floorboard. The officers stopped the man, subjected him to a patdown search, and then inspected the interior of the vehicle for other weapons. During the search of the passenger compartment, the police discovered an open pouch containing marijuana and seized it. This Court upheld the validity of the search and seizure under *Terry*. The Court held first that, in the context of a roadside encounter, where police have reasonable suspicion based on specific and articulable facts to believe that a driver may be armed and dangerous, they may conduct a protective search for weapons not only of the driver's person but also of the passenger compartment of the automobile. 463 U. S., at 1049. Of course, the protective search of the vehicle, being justified solely by the danger that weapons stored there could be used against the officers or bystanders, must be "limited to those areas in which a weapon may be placed or hidden." *Ibid.* The Court then held: "If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." *Id.,* at 1050; accord, *Sibron,* 392 U. S., at 69–70 (WHITE, J., concurring); *id.,* at 79 (Harlan, J., concurring in result).

The Court in *Long* justified this latter holding by reference to our cases under the "plain-view" doctrine. See *Long, supra,* at 1050; see also *United States* v. *Hensley,* 469 U. S. 221, 235 (1985) (upholding plain-view seizure in context

of *Terry* stop).   Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.   See *Horton* v. *California*, 496 U. S. 128, 136–137 (1990); *Texas* v. *Brown*, 460 U. S. 730, 739 (1983) (plurality opinion).   If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—*i. e.*, if "its incriminating character [is not] 'immediately apparent,'" *Horton, supra,* at 136—the plain-view doctrine cannot justify its seizure.   *Arizona* v. *Hicks*, 480 U. S. 321 (1987).

We think that this doctrine has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search.   The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point.   See *Illinois* v. *Andreas*, 463 U. S. 765, 771 (1983); *Texas* v. *Brown, supra,* at 740.   The warrantless seizure of contraband that presents itself in this manner is deemed justified by the realization that resort to a neutral magistrate under such circumstances would often be impracticable and would do little to promote the objectives of the Fourth Amendment.   See *Hicks, supra,* at 326–327; *Coolidge* v. *New Hampshire*, 403 U. S. 443, 467–468, 469–470 (1971) (opinion of Stewart, J.).   The same can be said of tactile discoveries of contraband.   If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure

would be justified by the same practical considerations that inhere in the plain-view context.[3]

The Minnesota Supreme Court rejected an analogy to the plain-view doctrine on two grounds: first, its belief that "the sense of touch is inherently less immediate and less reliable than the sense of sight," and second, that "the sense of touch is far more intrusive into the personal privacy that is at the core of the [F]ourth [A]mendment." 481 N. W. 2d, at 845. We have a somewhat different view. First, *Terry* itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of *Terry*, after all, is that officers will be able to detect the presence of weapons through the sense of touch and *Terry* upheld precisely such a seizure. Even if it were true that the sense of touch is generally less reliable than the sense of sight, that only suggests that officers will less often be able to justify seizures of unseen contraband. Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures.[4] The

---

[3] "[T]he police officer in each [case would have] had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification . . . and permits the warrantless seizure." *Coolidge* v. *New Hampshire*, 403 U. S. 443, 466 (1971) (opinion of Stewart, J.).

[4] We also note that this Court's opinion in *Ybarra* v. *Illinois*, 444 U. S. 85 (1979), appeared to contemplate the possibility that police officers could obtain probable cause justifying a seizure of contraband through the sense of touch. In that case, police officers had entered a tavern and subjected its patrons to patdown searches. While patting down the petitioner Ybarra, an "officer felt what he described as 'a cigarette pack with objects in it,'" seized it, and discovered heroin inside. *Id.*, at 88–89. The State argued that the seizure was constitutional on the grounds that the officer obtained probable cause to believe that Ybarra was carrying contraband during the course of a lawful *Terry* frisk. *Ybarra, supra*, at 92. This

court's second concern—that touch is more intrusive into privacy than is sight—is inapposite in light of the fact that the intrusion the court fears has already been authorized by the lawful search for weapons. The seizure of an item whose identity is already known occasions no further invasion of privacy. See *Soldal* v. *Cook County,* 506 U. S. 56, 66 (1992); *Horton, supra,* at 141; *United States* v. *Jacobsen,* 466 U. S. 109, 120 (1984). Accordingly, the suspect's privacy interests are not advanced by a categorical rule barring the seizure of contraband plainly detected through the sense of touch.

### III

It remains to apply these principles to the facts of this case. Respondent has not challenged the finding made by the trial court and affirmed by both the Court of Appeals and the State Supreme Court that the police were justified under *Terry* in stopping him and frisking him for weapons. Thus, the dispositive question before this Court is whether the officer who conducted the search was acting within the lawful bounds marked by *Terry* at the time he gained probable cause to believe that the lump in respondent's jacket was contraband. The State District Court did not make precise findings on this point, instead finding simply that the officer, after feeling "a small, hard object wrapped in plastic" in respondent's pocket, "formed the opinion that the object . . . was crack . . . cocaine." App. to Pet. for Cert. C–2. The

Court rejected that argument on the grounds that "[t]he initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous," as required by *Terry.* 444 U. S., at 92–93. The Court added: "[s]ince we conclude that the initial patdown of Ybarra was not justified under the Fourth and Fourteenth Amendments, we need not decide whether or not the presence on Ybarra's person of 'a cigarette pack with objects in it' yielded probable cause to believe that Ybarra was carrying any illegal substance." *Id.,* at 93, n. 5. The Court's analysis does not suggest, and indeed seems inconsistent with, the existence of a categorical bar against seizures of contraband detected manually during a *Terry* patdown search.

District Court also noted that the officer made "no claim that he suspected this object to be a weapon," *id.*, at C–5, a finding affirmed on appeal, see 469 N. W. 2d, at 464 (the officer "never thought the lump was a weapon"). The Minnesota Supreme Court, after "a close examination of the record," held that the officer's own testimony "belies any notion that he 'immediately'" recognized the lump as crack cocaine. See 481 N. W. 2d, at 844. Rather, the court concluded, the officer determined that the lump was contraband only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket"—a pocket which the officer already knew contained no weapon. *Ibid.*

Under the State Supreme Court's interpretation of the record before it, it is clear that the court was correct in holding that the police officer in this case overstepped the bounds of the "strictly circumscribed" search for weapons allowed under *Terry.* See *Terry,* 392 U. S., at 26. Where, as here, "an officer who is executing a valid search for one item seizes a different item," this Court rightly "has been sensitive to the danger . . . that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will." *Texas* v. *Brown,* 460 U. S., at 748 (STEVENS, J., concurring in judgment). Here, the officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to "[t]he sole justification of the search [under *Terry:*] . . . the protection of the police officer and others nearby." 392 U. S., at 29. It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize, see *id.*, at 26, and that we have condemned in subsequent cases. See *Michigan* v. *Long,* 463 U. S., at 1049, n. 14; *Sibron,* 392 U. S., at 65–66.

Once again, the analogy to the plain-view doctrine is apt. In *Arizona* v. *Hicks,* 480 U. S. 321 (1987), this Court held invalid the seizure of stolen stereo equipment found by police while executing a valid search for other evidence. Although

the police were lawfully on the premises, they obtained probable cause to believe that the stereo equipment was contraband only after moving the equipment to permit officers to read its serial numbers. The subsequent seizure of the equipment could not be justified by the plain-view doctrine, this Court explained, because the incriminating character of the stereo equipment was not immediately apparent; rather, probable cause to believe that the equipment was stolen arose only as a result of a further search—the moving of the equipment—that was not authorized by a search warrant or by any exception to the warrant requirement. The facts of this case are very similar. Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional. *Horton*, 496 U. S., at 140.

### IV

For these reasons, the judgment of the Minnesota Supreme Court is

*Affirmed.*

JUSTICE SCALIA, concurring.

I take it to be a fundamental principle of constitutional adjudication that the terms in the Constitution must be given the meaning ascribed to them at the time of their ratification. Thus, when the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures*, shall not be violated" (emphasis added), it "is

to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted," *Carroll* v. *United States*, 267 U. S. 132, 149 (1925); see also *California* v. *Acevedo*, 500 U. S. 565, 583–584 (1991) (SCALIA, J., concurring in judgment). The purpose of the provision, in other words, is to preserve that degree of respect for the privacy of persons and the inviolability of their property that existed when the provision was adopted—even if a later, less virtuous age should become accustomed to considering all sorts of intrusion "reasonable."

My problem with the present case is that I am not entirely sure that the physical search—the "frisk"—that produced the evidence at issue here complied with that constitutional standard. The decision of ours that gave approval to such searches, *Terry* v. *Ohio*, 392 U. S. 1 (1968), made no serious attempt to determine compliance with traditional standards, but rather, according to the style of this Court at the time, simply adjudged that such a search was "reasonable" by current estimations. *Id.*, at 22–27.

There is good evidence, I think, that the "stop" portion of the *Terry* "stop-and-frisk" holding accords with the common law—that it had long been considered reasonable to detain suspicious persons for the purpose of demanding that they give an account of themselves. This is suggested, in particular, by the so-called night-walker statutes, and their common-law antecedents. See Statute of Winchester, 13 Edw. I, Stat. 2, ch. 4 (1285); Statute of 5 Edw. III, ch. 14 (1331); 2 W. Hawkins, Pleas of the Crown, ch. 13, § 6, p. 129 (8th ed. 1824) ("It is holden that this statute was made in affirmance of the common law, and that every private person may by the common law arrest any suspicious night-walker, and detain him till he give a good account of himself"); 1 E. East, Pleas of the Crown, ch. 5, § 70, p. 303 (1803) ("It is said . . . that every private person may by the common law arrest any suspicious night-walker, and detain him till he give a good account of himself"); see also M. Dalton, The Country

Justice, ch. 104, pp. 352–353 (1727); A. Costello, Our Police Protectors: History of the New York Police 25 (1885) (citing 1681 New York City regulation); 2 Perpetual Laws of Massachusetts 1788–1798, ch. 82, § 2, p. 410 (1797 Massachusetts statute).

I am unaware, however, of any precedent for a physical search of a person thus temporarily detained for questioning. Sometimes, of course, the temporary detention of a suspicious character would be elevated to a full custodial arrest on probable cause—as, for instance, when a suspect was unable to provide a sufficient accounting of himself. At *that* point, it is clear that the common law would permit not just a protective "frisk," but a full physical search incident to the arrest. When, however, the detention did not rise to the level of a full-blown arrest (and was not supported by the degree of cause needful for that purpose), there appears to be no clear support at common law for physically searching the suspect. See Warner, The Uniform Arrest Act, 28 Va. L. Rev. 315, 324 (1942) ("At common law, if a watchman came upon a suspiciously acting nightwalker, he might arrest him and then search him for weapons, but he had *no right* to search before arrest"); Williams, Police Detention and Arrest Privileges—England, 51 J. Crim. L., C. & P. S. 413, 418 (1960) ("Where a suspected criminal is also suspected of being offensively armed, can the police search him for arms, by tapping his pockets, before making up their minds whether to arrest him? There is no English authority . . .").

I frankly doubt, moreover, whether the fiercely proud men who adopted our Fourth Amendment would have allowed themselves to be subjected, on mere *suspicion* of being armed and dangerous, to such indignity—which is described as follows in a police manual:

"Check the subject's neck and collar. A check should be made under the subject's arm. Next a check should be made of the upper back. The lower back should also be checked.

"A check should be made of the upper part of the man's chest and the lower region around the stomach. The belt, a favorite concealment spot, should be checked. The inside thigh and crotch area also should be searched. The legs should be checked for possible weapons. The last items to be checked are the shoes and cuffs of the subject." J. Moynahan, Police Searching Procedures 7 (1963) (citations omitted).

On the other hand, even if a "frisk" prior to arrest would have been considered impermissible in 1791, perhaps it was considered permissible by 1868, when the Fourteenth Amendment (the basis for applying the Fourth Amendment to the States) was adopted. Or perhaps it is only since that time that concealed weapons capable of harming the interrogator quickly and from beyond arm's reach have become common—which might alter the judgment of what is "reasonable" under the original standard. But technological changes were no more discussed in *Terry* than was the original state of the law.

If I were of the view that *Terry* was (insofar as the power to "frisk" is concerned) incorrectly decided, I might—even if I felt bound to adhere to that case—vote to exclude the evidence incidentally discovered, on the theory that half a constitutional guarantee is better than none. I might also vote to exclude it if I agreed with the original-meaning-is-irrelevant, good-policy-is-constitutional-law school of jurisprudence that the *Terry* opinion represents. As a policy matter, it may be desirable to *permit* "frisks" for weapons, but not to *encourage* "frisks" for drugs by admitting evidence other than weapons.

I adhere to original meaning, however. And though I do not favor the mode of analysis in *Terry*, I cannot say that its result was wrong. Constitutionality of the "frisk" in the present case was neither challenged nor argued. Assuming, therefore, that the search was lawful, I agree with the Court's premise that any evidence incidentally discovered in

the course of it would be admissible, and join the Court's opinion in its entirety.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE BLACK-MUN and JUSTICE THOMAS join, concurring in part and dissenting in part.

I join Parts I and II of the Court's opinion. Unlike the Court, however, I would vacate the judgment of the Supreme Court of Minnesota and remand the case to that court for further proceedings.

The Court, correctly in my view, states that "the dispositive question before this Court is whether the officer who conducted the search was acting within the lawful bounds marked by *Terry* [v. *Ohio*, 392 U. S. 1 (1968),] at the time he gained probable cause to believe that the lump in respondent's jacket was contraband." *Ante*, at 377. The Court then goes on to point out that the state trial court did not make precise findings on this point, but accepts the appellate findings made by the Supreme Court of Minnesota. I believe that these findings, like those of the trial court, are imprecise and not directed expressly to the question of the officer's probable cause to believe that the lump was contraband. Because the Supreme Court of Minnesota employed a Fourth Amendment analysis which differs significantly from that now adopted by this Court, I would vacate its judgment and remand the case for further proceedings there in the light of this Court's opinion.