**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 1, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

RUDY PEREZ,

Defendant - Appellee.

No. 10-3063

(D. Kansas)

(D.C. No. 2:09-CR-20096-KHV-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **BALDOCK**, and **HARTZ**, Circuit Judges.

Rudy Perez (Defendant) was charged in the United States District Court for the District of Kansas with possession of an illegal sawed-off shotgun. *See* 26 U.S.C. §§ 5841, 5861(d), and 5871. The district court granted Defendant's motion to suppress the shotgun, ruling that Kansas City, Kansas, police officer Patrick Locke unlawfully retrieved a bullet from Defendant's pocket after exceeding the permissible bounds of a protective frisk. The court held that in the absence of the bullet, the officer did not have probable cause to search

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Defendant's car, where the illegal weapon was found. The government appeals, arguing that the record provides no evidence to support the court's finding that Officer Locke continued to frisk Defendant after completing a frisk for weapons. We affirm because the finding was not clearly erroneous.

## I.    BACKGROUND

At approximately 6 p.m. on March 31, 2007, Officer Locke responded to a holdup alarm at a gas station. One of the station's attendants told him that there had been a gang-related fight and that someone had fired a shot with a handgun. The attendant showed Locke the gas station's surveillance video, which captured much of the incident. The video showed eight to ten Hispanic males and three cars in the gas station's parking lot. Although the video did not show the shot being fired, Locke could see the group scatter and two of the men get into and drive off in a mid-nineties maroon Ford Mustang convertible with Kansas license plates and a black ragtop. Both men had shaved heads and goatees. After watching the surveillance tape, the officer searched the gas station and found a spent nine-millimeter shell casing.

The following night Officer Locke was concluding his shift when he observed a vehicle roll through a stop sign without coming to a complete stop. He did not think it was "a real huge deal until [he] noticed it was a red Mustang with a black rag top." Aplt. App. at 20. He decided to stop the vehicle, given its make and model and its being occupied by two Hispanic males with shaved heads.

Recognizing "the possibility of weapons being in the car," he called for backup. *Id.* at 21. Officer Jesse Crawford responded. His patrol car contained a video camera that captured much of the stop. The resulting DVD was admitted into evidence at the suppression hearing.

As the two officers approached the vehicle, Officer Locke confirmed that its occupants were the two men he had seen in the surveillance video driving off in the maroon Mustang. Defendant was the driver. Locke asked him for his license and registration, and Defendant produced the documents. Locke put them on the roof of the car and, concerned that Defendant might be armed, asked him to step out of the car and place his hands on the roof so he could be frisked for weapons.

The video from Officer Crawford's camera shows the frisk. Officer Locke grabbed the area around Defendant's right pocket two to three times, grabbed Defendant's left pocket at least twice, and again grabbed Defendant's right pocket another two to three times. Next he patted down the lower portion of Defendant's right leg and lifted the pant leg to look at his ankle, repeated that sequence for the left leg, and then returned to the area around Defendant's right hip for a third time. He appears to feel around the right pocket and perhaps begins to reach into it, but stops, handcuffs Defendant, and retrieves what is presumably the bullet from the right pocket and inspects it. No conversation is audible because of the

noise from a Kansas Highway Patrol helicopter that was overhead to provide the officers a spotlight.

Officer Locke testified that after feeling an object in Defendant's pocket,[1] he "asked [Defendant] what it was and he advised that it was a bullet." *Id.* at 34. Locke said that because he "believed there was a weapon" in the Mustang, *id.* at 62, he first placed Defendant in handcuffs and then removed the bullet from Defendant's pocket, examined it, and determined that its caliber matched the spent nine-millimeter casing recovered at the gas station the night before. After telling Defendant that he suspected that the vehicle had been involved in the previous night's shooting, he asked Defendant "if there was anything illegal in the car and if . . . we could have his consent to search his vehicle." *Id.* at 38. Defendant consented, Locke placed him in the back of his patrol car, and the officers searched the Mustang. They found a loaded nine-millimeter pistol (Tec-9) and a sawed-off shotgun. When Defendant was placed under arrest, he volunteered that the guns belonged to him, not his brother (the car's other occupant).

The district court granted Defendant's suppression motion after an evidentiary hearing. It ruled that the initial stop was lawful, that Officer Locke

---

[1]It is uncertain whether Officer Locke felt the object in Defendant's right-front pocket, as Defendant asserts, or Defendant's right-rear pocket, as the district court determined. As the government concedes, however, deciding this case does not require resolving the question.

had reasonable suspicion to detain and question Defendant, and that Locke had

reasonable suspicion to frisk Defendant.  But the court found that Locke had

extended the frisk of Defendant beyond a protective search for weapons.  It

stated:

> After Officer Locke concluded his pat-down frisk for weapons, he continued to pat defendant's right rear pocket and slide his hand in that area to try to identify a small object in defendant's pocket. Officer Locke asked defendant to identify the object and defendant responded that it was a bullet.  Officer Locke then placed defendant in handcuffs.  Officer Locke reached into defendant's pocket and retrieved a nine millimeter shell casing which was a live round of ammunition.

*Id.* at 83.  The court then reasoned that the seizure of the bullet was unlawful,

explaining:

> A police officer may seize non-threatening contraband detected during a protective pat-down search if he feels an object whose contour and mass make its identity immediately apparent.  Minnesota v. Dickerson, 508 U.S. 366, 373, 376 (1993).  This exception does not apply here for two reasons.  First, Officer Locke did not ask about or retrieve the bullet until after he completed his pat-down search for weapons.  Second, from a review of the video and his testimony, Officer Locke did not immediately recognize the item as a bullet.  Indeed, he patted the area several times, started to manipulate the object and asked defendant to identify it.  In Dickerson, an officer determined that a lump in defendant's pants pocket was crack cocaine only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket"—which he already knew contained no weapon.  Id. at 378.  Because the officer continued to explore defendant's pocket after concluding that it contained no weapon, the Supreme Court held that the officer had overstepped the bounds of the strictly circumscribed search for weapons under Terry [v. Ohio, 392 U.S. 1 (1968)].  Id.  Likewise, after Officer Locke determined that defendant had no weapons on his person, he continued to pat and slide his hand on or near defendant's right pants

> pocket in an attempt to identify the object. Because Officer Locker's [sic] search of defendant went beyond a search of weapons under <u>Terry</u>, Officer Locke illegally seized the nine millimeter bullet from defendant's pocket.

*Id.* at 83–84 (footnote omitted). The court then held that, absent the bullet, the officers lacked probable cause to search Defendant's vehicle. And because it also ruled that Defendant did not voluntarily consent to the search of the car, the court suppressed the sawed-off shotgun as the fruit of an illegal search.

## II. DISCUSSION

The government concedes on appeal that the bullet was necessary to establish probable cause to search Defendant's car. The only issue before us is therefore whether Officer Locke lawfully learned of the bullet in Defendant's pocket.

The parties do not dispute what the applicable law is. Under *Terry v. Ohio*, 392 U.S. 1, 30 (1968), an officer may stop and briefly detain a person if he or she has reasonable suspicion that crime is afoot. If the officer also has a reasonable suspicion that the suspect is armed and dangerous, he may conduct a protective frisk to discover weapons. *See id*. at 29–30. Once the protective frisk is complete, however, further searching of the suspect is improper absent probable cause. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) ("[An] officer's continued exploration of [a suspect's] pocket after . . . conclud[ing] that it contain[s] no weapon [i]s unrelated to the sole justification of the search under

*Terry*: the protection of the police officer and others nearby." (brackets, ellipsis, and internal quotation marks omitted)).

The issue on appeal thus boils down to whether the district court properly found that Officer Locke had completed his protective frisk of Defendant before his exploration of Defendant's pocket led him to ask what the object in it was. When reviewing a district court's ruling on a suppression motion, "we accept the factual findings of the district court unless they are clearly erroneous." *United States v. Albert*, 579 F.3d 1188, 1193 (10th Cir. 2009) (internal quotation marks omitted).

The government challenges "[t]he district court['s] [finding] that it was not until after Office Locke completed 'the pat-down for weapons' that he felt a hard object in [Defendant's] pocket." Aplt. Reply Br. at 4. It contends that "[t]here was no visual evidence, and no testimony, that Officer Locke had completed the frisk before he felt the hard object in [Defendant's] pocket." *Id.* at 5. We disagree. Although the government is correct that "Officer Locke never testified that he was satisfied [Defendant] had no weapons in his pocket before he felt the unidentified, hard object," *id.* at 6, he also never definitively testified that he felt the object in Defendant's pocket before he completed his protective frisk. And the evidence as a whole can support the district court's finding.

The following exchange occurred between Locke and the prosecutor on direct examination:

Q. Okay. And you indicated that you did this Terry pat down when you were doing a pat down of the outer clothing. Did you make—did you make any observations?
A. Yes.
Q. Tell us what that was.
A. *I felt something in his pocket. I asked him what it was and he advised it was a bullet.*

Aplt. App. at 34 (emphasis added). Defense counsel engaged in a similar line of questioning on cross-examination:

Q. You have him get out of the car, correct?
A. Yes.
Q. And you do the pat down, correct?
A. Yes.
Q. *You feel the object in his pants?*
A. *Uh-huh.*
Q. *You don't know what it is?*
A. *Correct.*
Q. *You ask him what it is?*
A. *Correct.*
Q. He says it's a bullet?
A. Correct.
Q. And you – so you handcuff him at that point?
A. Correct.
Q. And it isn't until after he's handcuffed that you retrieve the bullet from his pocket, correct?
A. Correct.

*Id.* at 50–51 (emphasis added). Thus, on both direct examination and cross-examination Officer Locke appears to state that he asked Defendant what the object was promptly after feeling it. Certainly, the district court could properly make a finding to that effect. Consequently, we must assume that the officer felt the object only on his final external examination of the pocket. The remaining

question then is whether Locke had completed his protective frisk before that final touching of the pocket.

The answer to that question is not obvious. But there is adequate support for the district court's finding that the protective frisk had ended before Officer Locke's final external inspection of Defendant's pocket. First, the video shows (a) a thorough frisk of the pocket area and of Defendant's lower legs before Locke's final touching of the right pocket and (b) no frisking after Defendant is asked what the object in his pocket is (suggesting that there was no need for any further protective frisking). Second, Locke's testimony on cross-examination could be reasonably understood to say that he felt the object after completion of the protective frisk. The relevant exchange was as follows:

> Q. So you continued the Terry pat down—or I guess after he told you it was a bullet, that you—that wasn't really part of the Terry pat down. You just took it out of his pocket?
> A. Well at that point, it was a investigatory stop of the incident the day before.
> Q. I understand. *You'd already completed your Terry pat down?*
> A. Correct.
> Q. *And you felt an object in his pocket.* You asked what it was.
> A. Correct.
> Q. He told you it was a bullet.
> A. Yes.

*Id.* at 51–52 (emphasis added).

Accordingly, we hold that the district court's findings were not clearly erroneous.

## III.  CONCLUSION

We AFFIRM the judgment below.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge