[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14020
Non-Argument Calendar
_____

D.C. Docket No. 2:15-cr-00157-SPC-CM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH ROCCO DEBONA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(January 7, 2019)

Before WILLIAM PRYOR, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Joseph Debona appeals his conviction for possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1), challenging the denial of his motion to suppress evidence of a firearm obtained due to an allegedly unlawful seizure. After careful review, we affirm.

## I.

Just before 6:30 p.m. on July 6, 2015, the owner of a gun store located at the Star Plaza in North Fort Meyers, Florida, called 911 about a suspicious, red Ford Focus parked in the plaza parking lot. The gun-store owner reported the vehicle had two occupants, one male and one female, and that the female passenger had injected a needle into her arm.

Deputy Katherine McCann[1] responded to the call several minutes later. According to McCann, the area where the Star Plaza was located was known for narcotics use, prostitution, and burglaries. Upon arrival, she identified the Focus and without activating her overhead lights or siren, parked her marked squad car in the driving lane of the parking lot, perpendicular to the Focus but not blocking its exit. She got out and approached the Focus from the driver's side. The windows of the Focus were down and there were three occupants: Debona in the driver's seat; Shawna Spring in the front passenger seat; and William Santoro in the back seat, sitting next to a flat-screen television.

---

[1] McCann's last name is now Gallant. We use McCann for consistency with the record.

2

McCann identified herself as law enforcement and explained that a concerned business owner had called about the Focus. She asked Debona if "he would mind stepping out of the vehicle so [they] could talk." Debona responded, "yeah," opened the door, and got out. McCann was armed and in uniform, but her firearm remained holstered throughout the encounter.

While Debona was exiting the Focus, Deputy Julian Chala arrived on the scene in another marked squad car. Without activating his lights or siren, he parked in the parking aisle opposite the Focus and without blocking it. He exited his car, walked over to the Focus, and asked Debona if he would mind coming to the front of Chala's squad car to talk. Debona complied, leaving McCann with the other two passengers. Chala was armed and in uniform, with his firearm holstered.

Once Chala and Debona arrived near the front of Chala's patrol car, Chala explained why he was there and that he wanted to talk to Debona. Chala read Debona his *Miranda* rights, which was Chala's standard practice even if he was not arresting someone, and he explained that this did not mean Debona was in trouble, under arrest, or going to jail. Debona said he understood. Chala then asked Debona what he was doing at the Star Plaza. Debona responded that he was there to buy a television from his friend, Santoro (the back-seat passenger).

During this brief discussion, Chala observed that Debona was acting "very nervous," was "sweating a lot," and was not making eye contact. Chala also

3

noticed Debona touching his front pockets.  At one point, Debona put his hand inside his pocket, prompting Chala to tell Debona "please do not put your hands in [your] pockets."  Debona pulled his hand out but then put it back in again.  Chala again asked him to please not put his hands in his pockets.

Chala testified that, based on Debona's demeanor, he suspected that Debona might have a weapon, so he decided to conduct a patdown search.  Before doing so, Chala asked Debona if he had any weapons or illegal substances.  Debona answered "no."  Chala then told Debona that he was going to pat him down.  Without being asked, Debona turned around and put his hands on the hood of Chala's squad car.

During the patdown, Chala felt what appeared to be a pill bottle in Debona's front pocket.  Chala asked for permission to check Debona's pockets, and Debona consented.  In Debona's pockets, Chala found a wallet, multiple small plastic baggies, around $1,000 in cash, and a pill bottle with someone else's name on it.  Debona acknowledged that the pill bottle did not belong to him.  When Chala finished the search, Debona turned around and faced Chala.  At that point, Chala noticed a rectangular-shaped bulge behind Debona's front zipper.  Chala asked Debona what he had behind his zipper, but Debona didn't respond.  Chala stepped forward and again asked about the bulge.  Debona took one step back and then took off running, exclaiming "I'm not going back to jail."

4

Chala chased after Debona and eventually brought him down with a taser. McCann came up and handcuffed Debona. When they returned to the parking lot, another deputy showed Chala a gun on the ground near his squad car in the same direction that Debona had fled. Two witnesses saw Debona drop the gun.

Debona was indicted for possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress, and the district court held an evidentiary hearing at which McCann, Chala, and Spring (the front-seat passenger) testified. The court took the matter under advisement and then issued a written order denying Debona's suppression motion. Crediting the testimony of Deputies McCann and Chala, the court found that the initial encounter between McCann and Debona was consensual and therefore did not implicate the Fourth Amendment. The court also noted in its order that Debona "d[id] not raise any constitutional challenges to his encounter with Chala or his subsequent arrest," though it agreed with the government that the firearm was lawfully seized because Debona abandoned the firearm during flight from police.

Regarding that latter point, Debona's suppression motion argued only that McCann unlawfully seized him without reasonable suspicion, which he said tainted all events that followed. At the suppression hearing, the court indicated that it was inclined to rule against Debona on that point. So it asked defense counsel whether, if it found the initial encounter with McCann to be consensual, Debona wished to

5

raise any specific constitutional objection to the encounter with Chala.  Defense counsel conveyed his belief that Debona was subject to an "ongoing, unlawful detention."  Counsel also asserted that a reasonable person under the totality of the circumstances would not have felt free to leave after being led away from his car by a uniformed police officer.  Counsel then indicated that Debona's sweating and touching of his pockets did not provide reasonable suspicion to detain him further.  Following the hearing, Debona filed a supplemental memorandum, but he did not address his encounter with Chala or the government's abandonment argument.

After a jury trial, Debona was convicted and sentenced to 100 months of imprisonment.  He now appeals the denial of his motion to suppress.

## II.

When considering the denial of a motion to suppress, we review the district court's factual determinations for clear error and the application of the law to those facts *de novo*.  *United States v. Dixon*, 901 F.3d 1322, 1338 (11th Cir. 2018).  All facts are construed in the light most favorable to the prevailing party.  *Id.*

## III.

The Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. amend. IV.  "A seizure under the Fourth Amendment happens when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  *United States v. Franklin*, 323 F.3d

6

1298, 1301 (11th Cir. 2003). A seizure triggers constitutional scrutiny and must be justified by either reasonable suspicion or probable cause, depending on the severity of the intrusion. *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

"Not all interactions between law enforcement and citizens, however, implicate the scrutiny of the Fourth Amendment." *Id.* Even without particularized suspicion, officers may approach individuals on the street or other public places, ask them questions if they are willing, ask for identification, and request consent to search—"provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 200–01 (2002). Such "consensual" encounters do not trigger Fourth Amendment scrutiny. *Jordan*, 635 F.3d at 1186.

We discern the dividing line between a consensual encounter and a seizure by considering whether a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Drayton*, 536 U.S. at 202 (quotation marks omitted). This test is "objective and presupposes an *innocent* person." *Id.* (quotation marks omitted) (emphasis in original). In applying this test, we must consider the "totality of the circumstances." *Jordan*, 635 F.3d at 1186. Relevant factors to this analysis may include (1) whether the suspect's path is blocked; (2) whether identification is retained; (3) the suspect's age, education, and intelligence; (4) the length of the detention and questioning; (5) the number of

7

police officers present; (6) whether weapons are displayed; (7) any physical touching of the suspect; and (8) the language and tone of the officers. *Id.*

If a seizure has occurred, it must have an objective, particularized basis. As relevant here, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968)). A *Terry* stop must be justified at its inception and reasonably related in scope to the circumstances that justified the stop. *United States v. Griffin*, 696 F.3d 1354, 1358 (11th Cir. 2012). *Terry* also allows officers to conduct protective patdown searches for weapons based on reasonable suspicion. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). In particular, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a patdown search to determine whether the person is in fact carrying a weapon." *Id.* (quotation marks omitted).

Reasonable suspicion is a less demanding standard than probable cause and requires only a "minimal level of objective justification" that is "considerably less than" the preponderance of the evidence. *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). While pertinent facts may be subject to an innocent

8

interpretation when considered individually, such facts may still collectively give rise to reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002). Reasonable-suspicion analysis is not concerned with hard certainties but with probabilities, and officers may rely on inferences and deductions "that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981).

## IV.

Debona offers two grounds for suppression. First, and primarily, he argues that he was seized from the moment Deputy McCann asked him to step out of his Focus. Because reasonable suspicion did not support the seizure, Debona maintains, the stop was unlawful at its inception and any evidence obtained from the events that followed should be suppressed as fruits of the poisonous tree. Second, he asserts that even if the initial encounter with McCann was consensual, Deputy Chala seized him without reasonable suspicion when Chala ordered him to keep his hands out of his pockets.

We agree with the district court that initially, Debona's encounter with McCann was consensual and not a seizure. McCann did not need particularized suspicion to approach Debona in a public place and ask if he was willing to talk about the gun-store owner's complaint. *See Drayton*, 536 U.S. at 200–01. And she did not employ any coercive means to induce Debona's cooperation. *See id.*; *Jordan*, 635 F.3d at 1186. McCann did not activate her lights or sirens; she

9

approached the Focus on foot; she explained why she was there; she was the only officer present; and she did not ask for or retain Debona's identification, block his path, brandish a weapon, touch him, or speak to him in an authoritative manner.

These facts do not lead to the conclusion here that a reasonable person would not "feel free to decline the officer['s] requests or otherwise terminate the encounter." *See Drayton*, 536 U.S. at 202. Significantly, the district court found that McCann *asked*, not *ordered*, Debona if he would mind stepping out of the car, and Debona does not appear to challenge that finding on appeal.[2] Debona agreed and did so, without expressing any reluctance to talk about the gun-store owner's complaint. And a reasonable person would understand that an officer, for reasons of officer safety, would prefer to speak with a person who is not partially concealed in a car. *Cf. Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (noting "that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect"). Accordingly, McCann did not seize Debona, so she did not need reasonable suspicion.

---

[2] To the extent he does challenge that finding, he suggests that an officer's tone and language are largely irrelevant because no reasonable person would feel free to disregard even a politely phrased request from a police officer. But that argument is foreclosed by our precedent. *See Jordan*, 635 F.3d at 1186 (listing "the language and tone of voice of the police" as one of the factors relevant to the totality of the circumstances).

Nor was Debona seized at the time Chala arrived and asked Debona to walk over to his squad car to talk.[3]  Chala politely asked Debona to walk over to talk and promptly explained his reason for being there.  He did not block the Focus, ask for identification, activate his lights or sirens, brandish weapons, or use physical force.  While two officers were present on the scene, Debona's interactions were limited to a single officer at a time.  Chala's questioning was brief and general, simply asking Debona about what he was doing at the Star Plaza.  And before questioning Debona, Chala explicitly informed him of his rights, making sure to avoid any misunderstanding by emphasizing that this did not mean Debona was in trouble, under arrest, or going to jail.  All of these factors render the encounter consensual.

Debona highlights Chala's requests for Debona to not put his hands in his pockets, which he characterizes as orders that clearly conveyed a message that compliance was required.  But we do not believe that Chala's requests of Debona to "please" not put his hands in his pockets, viewed in the totality of the circumstances, converted what was a consensual encounter into a seizure.  An officer's "language and tone of voice" matter to the inquiry, *see Jordan*, 635 F.3d at 1186, and Chala's testimony does not indicate that he ordered Debona to keep

---

[3] The district court did not make any specific factual findings with regard to the encounter with Chala because Debona did not clearly raise this issue during the suppression hearing.  Thus, plain-error review likely applies.  *See United States v. Johnson*, 777 F.3d 1270, 1277–78 (11th Cir. 2015) (suppression arguments raised for the first time on appeal are review for plain error).  In any case, we may affirm for any reason supported by the record, *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012), and Debona has not established any error, let alone plain error.

his hands out of his pockets or "that compliance with the officer's request might be compelled." *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (quotation marks omitted). In fact, Debona ignored Chala's first request and put his hand back into his pocket, prompting Chala's second request. While Debona appears to have then complied, very little else had changed about the circumstances. Their encounter up to that point had been brief and non-coercive, and, significantly, Debona had not, by words or actions, indicated that he wished to terminate the encounter with Chala. Under the totality of the circumstances, Chala's polite requests relating to officer safety did not transform what was a consensual encounter into a seizure.

Moreover, at the point Debona placed his hand in his pocket despite Chala's request not to, it was reasonable for Chala to conduct a brief protective patdown search to check Debona for weapons. *See Dickerson*, 508 U.S. at 373. The Star Plaza was known for burglaries, and there was a flat-screen television in the back seat of the Focus. Chala also testified that Debona was acting "very nervous," he was "sweating a lot," he was not making eye contact, and he was touching his front pockets. Faced with these facts, it would not be unreasonable for an officer to be concerned that Debona was carrying a weapon in one of his pockets.

Additionally, after the patdown, Debona voluntarily consented to the search of his pockets, which turned up apparent contraband. *See United States v. Kapperman*, 764 F.2d 786, 793 (11th Cir. 1985) (searches conducted by means of

12

consent are valid, so long as the consent is voluntary).  Then, Chala noticed a suspicious, rectangular-shaped bulge behind Debona's front zipper, asked him about it, and Debona yelled, "I'm not going back to jail," and took off running. Clearly, at that point, the deputies were authorized to seize Debona.  *See Jordan*, 635 F.3d at 1187 ("[T]he presence of 'a visible, suspicious bulge' on an individual may give rise to reasonable suspicion, particularly when the individual is present in a high-crime area.").

For all of these reasons, we see no constitutional infirmity with regard to the encounter on July 6 that would require suppression of the firearm that Debona discarded in the Star Plaza parking lot.  Accordingly, we affirm the denial of Debona's motion to suppress and his § 922(g)(1) conviction.

**AFFIRMED.**