People v Jennings (2019 NY Slip Op 05838)





People v Jennings


2019 NY Slip Op 05838


Decided on July 30, 2019


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 30, 2019

Renwick, J.P., Richter, Gesmer, Kern, Singh, JJ.


9135 1909/17

[*1]The People of the State of New York, Appellant,
v Frederick Jennings, Defendant-Respondent.


Cyrus R. Vance, Jr., District Attorney, New York (David P. Stromes of counsel), for appellant.
Janet E. Sabel, The Legal Aid Society, New York (Allen Fallek of counsel), for respondent.



Order, Supreme Court, New York County (Daniel P. Conviser, J.), entered on or about January 3, 2018, which granted defendant's suppression motion, unanimously reversed, on the law, and the motion denied.
At the suppression hearing, Parole Officer Kimberly Williams testified that she was responsible for supervising defendant, who was on postrelease supervision after having served a prison sentence for robbery in the second degree. When defendant was released from prison, he signed a "Certificate of Release to Post-Release Supervision," which set forth various conditions of his release. In that document, he stated that he understood that "[his] person, residence and property are subject to search and inspection." He also agreed to permit his parole officer to visit him at his residence and to "search and inspect[] . . . [his] person, residence and property." He further agreed that he would not own, possess, or purchase any firearm without his parole officer's permission. When Williams began supervising defendant, she reviewed the form with him, and he stated that he understood the conditions of his release.
In the beginning of 2017, defendant violated the terms of his supervision in numerous ways, including failing to report to Williams, using marijuana, failing to attend a drug treatment program, and violating his curfew. Williams subsequently obtained a parole absconder warrant authorizing her to take defendant into custody. On the evening of May 11, 2017, Williams and a group of other parole officers executed the warrant at an apartment defendant shared with his mother and young siblings. When Williams knocked on the door, defendant's mother answered and let the officers inside, but told them that defendant was not home. Williams and her team decided to search the apartment to look for defendant because from past experience, she knew that parolees often hid in apartments to avoid apprehension.
Williams and her supervisor, Parole Officer Medina, went to defendant's bedroom, knocked on the door and announced themselves before entering. Inside the bedroom, they saw four men and noticed a strong odor of marijuana. The officers asked the four men to leave the room, and they complied. Although the officers did not see defendant in the bedroom, they decided to search for him in the bedroom's "big" closet because it was "a good hiding place" and Williams had "found people in a closet before." The closet was full of hanging clothes, and there were bags of clothing and shoes on the floor.
The officers split the task of searching the closet, with Williams searching the left half, and Medina searching the right half. To see if defendant was hiding in the closet, Williams separated the hanging clothes "so [she] could open the space and be able to see that area." As she pushed the clothes, she inadvertently felt a "heavy object" in the right outside waist pocket of a goose jacket. Williams knew the jacket belonged to defendant because she had seen him wearing it in the past.
Upon feeling the outside of the jacket, Williams immediately recognized the object as a handgun because she previously had felt the outline of firearms during searches of other homes. Medina also felt the jacket and asked Williams "do you think it's what I think," "mean[ing]" "a [*2]firearm," and Williams responded "yes." Medina held open the jacket's pocket, and the officers observed a plastic bag; when they opened the bag, they saw a handgun. The officers took photographs, and placed the handgun back into the pocket because they had no place to secure it. They then contacted the New York City Police Department, who subsequently arrived with a search warrant and recovered the firearm.
The hearing court granted defendant's motion to suppress the firearm, finding that the recovery of the weapon was improper because it was not substantially related to the officers' duties at the time. The court concluded that the officers' actions tainted the subsequent search warrant, requiring suppression of the weapon. The People now appeal.
Although "a parolee does not surrender his [or her] constitutional rights against unreasonable searches and seizures merely by virtue of being on parole," parolees nevertheless have a "reduced expectation of privacy" (People v McMillan, 29 NY3d 145, 148 [2017] [internal quotation marks and citation omitted]; see Samson v California, 547 US 843, 852 [2006]). Thus, when evaluating the reasonableness of a parole officer's search, the fact that defendant is on parole "is always relevant and may be critical" (People v Huntley, 43 NY2d 175, 181 [1977]). Indeed, conduct that may be unreasonable with respect to an ordinary citizen may be reasonable with respect to a parolee (id.).
In Huntley, the Court of Appeals "relied on the dual nature of a parole officer's duties and a parolee's reduced expectation of privacy to hold that a parolee's constitutional right to be secure against unreasonable searches and seizures is not violated when a parole officer conducts a warrantless search that is rationally and reasonably related to the performance of the parole officer's duties" (McMillan, 29 NY3d at 148; see Huntley, 43 NY2d at 179, 181; People ex rel. Watson v Commissioner of N. Y. City Dept. of Correction, 149 AD2d 120, 123 [1st Dept 1989]). "It would not be enough necessarily that there was some rational connection; the particular conduct must also have been substantially related to the performance of duty in the particular circumstances (Huntley, 43 NY2d at 181).
Applying this standard, we find that Parole Officer Williams, whose testimony the hearing court credited, acted lawfully in retrieving the firearm from defendant's jacket pocket. While executing a valid parole warrant, and in the course of searching for defendant pursuant to that warrant, Williams inadvertently felt an object, that both she and her supervisor believed to be a gun, in the jacket pocket. Because parolees are not permitted to possess firearms, Williams's discovery meant that defendant was in further violation of the conditions of his supervised release. Thus, the minimally invasive step of retrieving the gun from the pocket was "rationally and reasonably related to the performance of [her] duty as [defendant's] parole officer" (Huntley, 43 NY3d at 179; see People v Andrews, 136 AD3d 596, 596 [1st Dept 2016], lv denied 27 NY3d 1128 [2016] ["the parole officers were entitled to perform a warrantless search of defendant's apartment since their conduct was rationally and substantially related to the performance of their official duties"]).
The suppression court mistakenly concluded that Officer Williams's removal of the gun from the pocket was not related to her duty at the time because the only purpose of her searching the apartment was to locate defendant, not to find contraband. Although at the time Williams first entered the apartment, she had no plans to search for weapons, her duties included looking for defendant, who could be hiding in the closet. Upon learning that defendant was in possession of a weapon, which was a violation of his parole conditions, Williams was duty-bound to secure it (see Huntley, 43 NY2d at 181 [parole officer's duty includes the "obligation to detect and to prevent parole violations for the protection of the public from the commission of further crimes"]; People v June, 128 AD3d 1353, 1354 [4th Dept 2015], lv denied 26 NY3d 931 [2015] [because parole officers who discovered parole violations during a routine home visit were entitled to "intensify() their search," the handgun they subsequently found should not have been suppressed]).
The suppression court's narrow view of Officer Williams's duty cannot be reconciled with the Court of Appeals's decision in Huntley. In Huntley, a parole officer obtained a parole violation warrant for a defendant who had failed to report. Prior to the issuance of the warrant, the officer had no knowledge as to the defendant's connection with narcotics. The parole officer [*3]executed the warrant, took the defendant into custody, and conducted a "thorough, exploratory search of his apartment" (43 NY2d at 180), which uncovered drugs and drug paraphernalia. The Court upheld the search as "rationally and reasonably related to the performance of" the parole officer's duty (id. at 179). Likewise here, although Williams had no prior knowledge as to defendant's possession of a weapon, upon discovering that information during the course of her search, she was entitled, as part of her duties as a parole officer, to recover it. Indeed, the suppression court's analysis might lead to the absurd result that had defendant been hiding in the closet, Williams still would not have been able to seize the gun because she did not enter the apartment with the express purpose of looking for a weapon.
The suppression court's reliance on People v Diaz (81 NY2d 106 [1993]), is misplaced. In Diaz, a case that did not involve a search conducted by a parole officer, the Court of Appeals rejected a "plain touch" exception to the search warrant requirement. In upholding the search here, we do not rely on the "plain touch" doctrine. Instead, we find Officer Williams's conduct was permissible under the entirely separate framework for evaluating the lawfulness of searches by parole officers set forth in Huntley.[FN1]
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 30, 2019
CLERK



Footnotes

Footnote 1: It bears noting that the United States Supreme Court, as well as the overwhelming majority of states, have adopted the "plain touch" doctrine (see e.g. Minnesota v Dickerson, 508 US 366 [1993]). Although Diaz relied, in part, upon state constitutional principles, its reasoning was undermined by the Supreme Court's decision in Dickerson. However, because we are required, as an intermediate appellate court, to follow Court of Appeals precedent, we decline the People's invitation to reject Diaz.