[Cite as *State v. Harris*, 2011-Ohio-2311.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                        :          C.A. CASE NO.    24170

v.                                                       :          T.C. NO.    09CR3986

LUTHER W. HARRIS                          :          (Criminal appeal from
                                                   Common Pleas Court)
    Defendant-Appellant                     :

                                                            :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ___13th___ day of ___May___, 2011.

· · · · · · · · · ·

LAURA M. WOODRUFF, Atty. Reg. No. 0084161, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. No. 0012093, 4428 N. Dixie Drive, Dayton, Ohio 45414
        Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

{¶ 1}   This matter is before the Court on the Notice of Appeal of Luther Harris, filed July 27, 2010.  On February 16, 2010, Harris was indicted on one count of possession of crack cocaine, in an amount which equaled or exceeded 10 grams but was less than 25 grams, in violation of R.C. 2925.11(A), a felony of the second degree.  Harris pled not

guilty, and on March 30, 2010, he filed a motion to suppress. After a hearing, the trial court overruled the motion. On June 9, 2010, the prosecutor filed a Bill of Information, charging Harris with one count of possession of crack cocaine, in an amount less than one gram, in violation of R.C. 2925.11(A), a felony of the fifth degree, and one count of trafficking in marijuana, in violation of R.C. 2925.03(A)(2), a felony of the fifth degree.

{¶ 2} On June 9, 2010, Harris withdrew his plea of not guilty and pled no contest to the indicted charge of possession of crack cocaine, and he pled guilty to the offenses set forth in the Bill of Information. The trial court sentenced Harris, on July 20, 2010, to a mandatory two year term on the indicted charge, and to six months on each offense in the Bill of Information, with all counts to be served concurrently with each other and consecutively to Harris' sentence in another matter.

{¶ 3} At the suppression hearing, Officer Jeff C. Hieber of the Dayton Police Department testified. At the time of the hearing, Heiber had been with the Dayton Police Department for nine years. According to Hieber, on November 25, 2009, between 5:30 and 6:00 p.m., he observed a blue Chevy truck stopped in the middle of the roadway near the intersection of Otterbein Avenue and Lori Sue Avenue. As Hieber approached the vehicle, it accelerated and "got over onto the correct side of the roadway" and proceeded forward. Hieber then observed the vehicle make first a left turn, and then a right turn onto a cul de sac, without signaling, and Hieber initiated a traffic stop. According to Hieber, the cul de sac is adjacent to a high-crime area. When Hieber pulled behind the vehicle, the driver "had put his car from drive into reverse cause I saw his back-up lights come on momentarily. And then he pressed his brakes, put the car into park, and I walked up and made contact with

him at the driver's side window." Harris, the driver, was the only occupant of the truck, and when he rolled his window down, Hieber detected "a very strong smell of burning marijuana."

{¶ 4} Hieber advised Harris that he stopped him because Harris failed to use his turn signals. Harris stated that he was lost and trying to find the home of a friend. When Hieber asked Harris for identification, Harris "was having a hard time finding it" and "looked for several minutes." Hieber asked Harris about the smell of marijuana, and Harris stated that he "had a marijuana cigarette in his car that was burning and that that was the smell I was smelling. But he had just, prior to me stopping him, had finished with the cigarette and had flicked the remaining roach out the window." According to Hieber, "[m]any times people have told me on traffic stops when I've smelled marijuana they have said, I don't have any more drugs; there was, but it's gone now; we just finished it. And then later on the fact [is] they had a large amount of drugs in their car that they were trying to conceal." Hieber allowed Harris to continue to look for his license, and after Harris could not find it, Hieber asked Harris to step out of his truck.

{¶ 5} When Harris exited the truck, Hieber removed his X26 Taser and pointed it at Harris for his protection, due to the fact that Hieber was alone, in a high crime area, and it was dark. Heiber told Harris to turn around and put his hands on his truck. While holding his Taser in one hand, Heiber conducted a "one-hand pat down" of Harris. Hieber then "explained to him that I was going to walk him back and place him in the back of my car. I was explaining to him what we were going to do before we did it. I was trying to put him at ease, as well. And I explained to him that I didn't want to have to Taser him and if he tried

to run or fight with me or anything, I would be forced to tase him. I didn't want to have to do that. * * * He stated he understood. And I said as long as your license is valid, all I plan on trying to do right now is probably just write you a ticket and cut you loose * * *."

{¶ 6} When they reached his cruiser, Hieber stated that he was "not satisfied" with his partial initial pat down, and he put his Taser away and asked Harris to turn around and place his hands on the cruiser so Hieber could conduct a complete pat down. Instead of placing his hands on the cruiser, Harris initially put his hands straight up in the air. Hieber again instructed him to place his hands on the cruiser and to spread his legs. Hieber testified that Harris was "really, really, stiff," and "he wouldn't spread his legs very far." According to Hieber, "people, right before they were going to run or fight with me, * * * they would tense up like that."

{¶ 7} On cross-examination, Hieber was asked, after the initial pat down, if he still suspected that Harris was "dangerous," thereby justifying the second pat down. Hieber replied, "Well, it was his overall demeanor to where when I asked him to place his hands on the top of my car, he shot them straight up in the air like that (demonstrating). And that just - - that never happens. * * *

{¶ 8} "And then, when I asked him to put his hands down, I had to say it like several times. * * * He finally did. And then he tensed up."

{¶ 9} Hieber was again asked why he continued to believe that Harris could be armed and dangerous, and he replied, "I didn't know. * * * I wasn't ultimately satisfied. That's why I did my correct pat down with both hands. I didn't know."

{¶ 10} Harris was asked, based upon his experience, where a weapon might be found

in the course of a "normal pat down," and he replied, "Anywhere. * * * Men * * * can keep a weapon underneath their armpits. They can keep them down their pants. They can keep them in their socks.

{¶ 11} "I didn't get anywhere close to his socks or his ankle or his knees.

{¶ 12} "You can keep a weapon shoved down the front of your pants. You can keep a weapon in your sleeves, here (indicating). * * * some guys carry guns, put them in the small of their back."

{¶ 13} In the course of the second pat down at his cruiser, Hieber felt "a very large, hard rocky substance" in Harris' left front pocket that Hieber recognized to be crack cocaine. Hieber asked Harris to identify the substance, and Harris initially did not respond. He then told Hieber that it was "dope." Hieber retrieved a baggie with a large rock of crack cocaine from Harris' pocket, placed Harris in the cruiser, and field tested the substance, confirming that it was crack cocaine.

{¶ 14} Hieber then placed Harris under arrest and read him his *Miranda* rights from a card provided by the police department. Harris indicated his understanding of his rights, and he agreed to answer Hieber's questions, without any threat, promise or force on the part of Hieber. Harris did not ask to terminate the interview or for an attorney, and he did not appear to be incapable of understanding Hieber's questions. In the course of an inventory search of Harris' truck, an additional small amount of crack cocaine was found.

{¶ 15} The trial court issued an Order that provides, "the Court hereby overrules Defendant's Motion to Suppress for the reasons stated on record during Criminal Docket on May 11, 2010." The trial court's factual findings were consistent with Heiber's testimony.

The trial court found that Harris twice failed to signal when turning, and that the subsequent stop for the traffic violations occurred in a high crime area. The court noted that Harris' truck smelled strongly of marijuana, and that Harris admitted that he had recently smoked marijuana. The court found that Harris could not locate his license, and he was removed from the truck at Taser point. The court noted that Heiber conducted a "half pat down" with one hand at Harris' truck and then a complete pat down at his cruiser. The court found that Hiber felt a "chunky substance," and after being asked twice to identify it, Harris stated that it was "dope." Hieber field tested the substance, determined that it was crack, and then *Mirandized* Harris, who made statements to Heiber. The court noted that additional crack was found in Harris' truck.

{¶ 16} The trial court concluded that Hieber had a reasonable articulable suspicion to initiate a traffic stop for the improper turns. The court found that under the totality of the circumstances, it was reasonable for Hieber to remove Harris from the truck and take him to the cruiser, since the car smelled of marijuana. Further, Harris admitted that he had recently smoked marijuana, and he could not find his license. The court further held that it was reasonable for Hieber to perform a complete pat down at the cruiser before placing Harris inside the vehicle. The court noted that Hieber "immediately" knew that the substance in Harris' pocket was crack, and that Harris stated that it was "dope." Accordingly, it was constitutional for Hieber to retrieve it. Finally, the court concluded that Harris voluntarily waived his *Miranda* rights, and that the evidence was constitutionally obtained.

{¶ 17} Harris asserts one assignment of error as follows:

{¶ 18} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN FAILING

TO SUPPRESS CONTRABAND OBTAINED FROM AN ILLEGAL SEARCH."

{¶ 19} According to Harris, the "totality of the circumstances herein indicate that the second pat-down and search was not made by the arresting officer for the purpose of 'officer safety' which should have been satisfied by the first pat-down. Rather, the second pat-down was performed for the purpose of finding contraband (drugs). Thus, it was intrusive beyond what may have been justified in the initial stop and in violation of the Fourth Amendment, * * * ."

{¶ 20} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." *State v. Purser*, Greene App. No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 21} The Fourth Amendment to the U.S. Constitution, applicable to the States through the Fourteenth Amendment, provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall

issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Violations of the Fourth Amendment require courts to apply the exclusionary rule, suppressing use of any evidence that was illegally obtained. *Mapp v. Ohio* (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

**{¶ 22}** The propriety of a police officer's pat down search is governed by *Terry v. Ohio* (1968), 392 U.S. 1. An officer may conduct a pat down search of a detained person "'for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *State v.Lewis*, Montgomery App. No. 23643, 2010-Ohio-4156, ¶ 9, quoting *Terry*, at 21. "'The officer, having satisfied himself or herself that the suspect has no weapon, is not justified in employing *Terry* as a pretext for a search for contraband.'" *State v. Dickerson*, 179 Ohio App.3d 754, 2008-Ohio-6544, ¶ 21, quoting *State v. Evans*, 67 Ohio St.3d 405, 414, 1993-Ohio-186.

**{¶ 23}** "While a police officer is conducting a lawful pat down search for weapons, the officer may retrieve any contraband or incriminating evidence he feels during the course of the pat down, as long as the incriminating character of the contraband is immediately apparent to the officer through his sense of touch. *Minnesota v. Dickerson* (1993), 508 U.S. 366, 375-376, 113 S.Ct. 2130, 124

L.Ed.2d 334. In this context, an object's incriminating character is immediately apparent if the police officer has probable cause to associate the object with criminal activity. (Citation omitted). Probable cause to associate an object with criminal activity does not demand certainty in the minds of police, but instead merely requires that there be a 'fair probability' that the object they see [or feel] is illegal contraband or evidence of a crime." *State v. Jones*, Montgomery App. No. 19248, 2002-Ohio-4681, ¶ 10.

{¶ 24} Harris concedes that his failure to signal when turning is "a proper basis" for the traffic stop. Although he asserts that he was only subject to citation for a minor misdemeanor, namely possession of marijuana, Harris did not produce identification, thus he was removed from the car and subject to a pat down. See *Evans*, at 410. (upholding a pat down search that was incident to the subject's failure to produce a driver's license, because the failure to produce the license meant that the officers were going to have to place the subject in the rear of their cruiser while verifying his information).

{¶ 25} Hieber, an experienced officer, was alone with Harris in a high crime area. With his Taser in one hand for protection, Hieber was unable to initially complete a thorough pat down of Harris, and he testified that he "wasn't ultimately satisfied," and that he "didn't know" if Harris was armed after his "half pat down." Hieber testified that he did not initially pat down the areas of Hieber's knees or ankles, where, in his experience, weapons may be hidden. Harris' demeanor was tense, and Hieber believed that Harris might become combative or flee. Since a reasonably prudent man in these circumstances would be warranted in the belief

that his safety was in danger, the second pat down of Harris was justified.   As the trial court noted, once Hieber felt what he immediately recognized to be crack cocaine in Harris' pocket, he was entitled to remove it.   In other words, Hieber did not employ the holding in *Terry* as a pretext to search for contraband.

{¶ 26} The trial court did not err in overruling Harris' motion to suppress, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Laura M. Woodruff
J. Allen Wilmes
Hon. Barbara P. Gorman, Administrative Judge
(trial judge - Hon. Michael T. Hall)