EDWIN A. LOMBARD, Judge.
hThe defendant, Jody Butler, argues that the trial court erred in denying his motion to suppress the evidence and statement. After review of the record in light of the applicable law and arguments of the parties, we agree.

*124
Relevant Facts and Procedural History

The defendant was arrested on July 27, 2010, at Seventh and Danneel Streets and charged by bill of information on August 4, 2010, with one count of possession of marijuana in violation of La.Rev.Stat. 40:966(E) and one count of possession of cocaine with intent to distribute in violation of La.Rev. Stat. 40:967(A). After arraignment, he pleaded not guilty and filed various motions, including the motions to suppress the evidence and statement at issue in this appeal. The trial court denied the motions and, because a trial date was imminent, filed an emergency writ application with this court. This court denied the writ application, stating that the defendant had an adequate remedy on appeal. State v. Butler, unpub. 2010-1773 (La.App. 4 Cir. 12/22/10). On January 4, 2011, a twelve-person jury found the defendant guilty of (1) possession of marijuana in violation of La.Rev.Stat. 40:966(E) and (2) simple possession of cocaine in violation of La.Rev. Stat. 40:967(C). Subsequently, the trial court sentenced the |2defendant to four years at hard labor on each count. After the defendant moved for an appeal (which was granted), the State filed a multiple bill charging the defendant as a quadruple offender. After a hearing, the trial court vacated the four-year sentence originally imposed as to each count, and sentenced the defendant to life imprisonment as a quadruple offender without the benefit of probation, parole, or suspension of sentence on count one.
This appeal follows.

Standard of Review

When the legality of evidence seized without a warrant is put at issue by a motion to suppress, the State bears the burden of proving admissibility, La.Code Crim. Proc. art. 703(D), and we review that ruling under the abuse of discretion standard. See State v. Wells, 2008-2262, p. 4 (La.7/6/10), 45 So.3d 577, 580. While this standard entitles the trial court’s determination to great weight, it will not shield, immunize, or insulate that ruling from an in-depth review. See State v. Jackson, 11-923, p. 6 (La.App. 3 Cir. 6/6/12), 92 So.3d 1243 (Thibodeaux, CJ, dissenting).

Applicable Law

The Fourth Amendment of the United States Constitution and Article I, Section 5 of the Louisiana Constitution protect persons from unreasonable searches and seizures. Thus, “the police may briefly detain and interrogate an individual in a public place, they may make an investigatory stop only if it is based upon a reasonable, articulable suspicion that the individual has engaged in, is engaging in, or is about to engage in criminal activity.” State v. Dobard, 01-2629, p. 2 (La.6/21/02), 824 So.2d 1127, 1129 (emphasis added); see also La.Code Crim. Proc. art. 215.1 (a police officer “may stop a person in a public place whom he 1 ¿reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.”); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (the right to make such an investigatory stop must be based upon reasonable suspicion that the individual has committed, or is about to commit, an offense).
Louisiana jurisprudence and statutory authority specifically holds that a lawful detention for questioning does not automatically give the officer authority to conduct a pat-down for weapons. State v. Francis, 2010-1149, 2010-1150 (La.App. 4 Cir. 2/16/11), 60 So.3d 703; see State v. Sims, 2002-2208 (La.6/27/03), 851 So.2d 1039, 1043 (even after a lawful investigatory stop, a police officer may *125 frisk the suspect only where a reasonably prudent person would be warranted in the belief that his safety or that of others is in danger); La.Code Crim. Proc. art. 215.1(B) (an officer may stop a person for questioning whom he reasonably suspects has committed a crime and, if he “reasonably suspects that he is in danger,” he may frisk the suspect). The threshold established for a protective frisk is not unduly burdensome. Rather, the reasonableness of a frisk is governed by an objective standard, Sims, supra; State v. Dumas, 2000-0862, pp. 2-3 (La.5/4/01), 786 So.2d 80, 81-82, and requires only that an officer establish only that a “substantial possibility” of danger existed, not that it was more probable than not that the detained individual was armed and dangerous. Sims, supra; State v. Hunter, 375 So.2d 99, 102 (La.1979). Even under this lenient standard, however, an officer must articulate some facts that led him to believe that the individual was armed and dangerous to justify a frisk. Sims, supra; Hunter, 375 So.2d at 101 (La.1979). Thus, if (as appears in this case) the pat-down occurred while the defendant was merely being detained on an investigatory stop, the pat-down (without the Larticulation of some fact to justify the frisk) was clearly a transgression of constitutional and statutory boundaries. If, however, the officers had probable cause to arrest the defendant, the frisk was constitutional as a search incident to arrest. Again, the threshold established for a finding of probable cause is neither high nor novel. See Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (probable cause to arrest exists when the detaining office articulable knowledge of particular facts sufficient to reasonably suspect that the detained person of criminal activity). The determination of whether probable cause for an arrest existed at the time of the pat-down is a “purely objective” determination that takes into account “all of the information known collectively to the law enforcement personnel involved in the investigation.” State v. Elliott, 2009-1727 (La.3/16/10) 35 So.3d 247, 251 (citation and internal quotation marks omitted); see also State v. Finklea, 313 So.2d 224 (La.1975) (whether probable cause existed at the time of the arrest must be determined without regard to the result of the subsequent search).
The police are not, of course, proscribed from interaction with members of the public and they clearly have the right to engage anyone in conversation, even without reasonable grounds to believe that they have committed a crime, as long as the person approached by the police officer remains free to disregard the encounter and walk away. Dobard, 01-2629, p. 3, 824 So.2d at 1130. Because evidence recovered and/or statements made as a result of an unconstitutional search and seizure may not be used in a subsequent prosecution, the Louisiana Supreme Court has articulated a useful three-tier analysis of interactions between citizens and the police. State v. Hamilton, 09-2205, p. 4 (La.5/11/10), 36 So.3d 209, 212; State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179, 1183. First, there is no seizure (and, thus, no Fourth Amendment implication) during “mere communication with police | f,officers and citizens where there is no coercion or detention.” Hamilton, supra. The second tier consists of brief seizures pursuant to Terry v. Ohio, supra, wherein the officer must have “an objectively reasonable suspicion, supported by specific and articulable facts, that the person is, or is about to be, engaged in criminal activity.” Hamilton, supra. The third tier is a custodial arrest where an officer needs probable cause to believe that the person has committed a crime. Id. Accordingly, *126 law enforcement officers may approach an individual on the street and ask him if he is willing to answer questions, but “an individual has been actually stopped or seized, for constitutional purposes, when he submits to a show of police authority or when he is physically contacted by the police.” Hamilton, 09-2205, p. 5, 36 So.2d at 213 (citing State v. Tucker, 626 So.2d 707, 710 (La.1993)). Thus, “[t]he prime characteristic of any Fourth Amendment seizure” is “whether, under the totality of circumstances, a reasonable person would not consider himself or herself free to leave.” Fisher, 720 So.2d at 1183 (citations omitted). “Ultimately, whether a person has been arrested depends on circumstances indicating an intent to impose an extended restraint on the person’s liberty.” Id. (emphasis in original).
The issue before us in this appeal is whether the trial court erred in denying the defendant’s motion to suppress. The defendant asserts that (1) Officer Goines and his partner lacked a sufficient basis to stop him and (2) Officer Goines did not articulate nor did he have a legitimate basis to justify conducting a frisk of his clothing. In response, the State offers a generic argument that “under the totality of the circumstances, Officer Goines had a reasonable, objective and particularized basis for conducting a patdown frisk of the defendant.”
| (The following evidence was adduced at the motion hearing and trial in this case. Officer Norbert Henry, a New Orleans Police Department (NOPD) officer assigned to the Sixth District, testified at the motion hearing that he and his partner, Officer Jemar Goines, first observed the defendant leaning into a SUV as they approached the intersection of Danneel and Seventh Streets in their patrol unit. Upon seeing the police, the driver of the SUV “sped off’ and the defendant “moved away from the vehicle” and then “hopped on his bike and ... rode the bike ... eastbound on Danneel.” When Officer Goines told the defendant to stop, the defendant immediately complied “[a]nd Mr. Butler came over to the police unit and Officer Goines told him to put his hands on the police car.” According to Officer Henry, his partner then “did a pat down for officer safety” and “[djuring the search ... discovered a clear plastic bag containing vegetable matter.” At that point, according to Officer Henry, Officer Goines placed the defendant under arrest and advised him of his Miranda rights.
On cross-examination, Officer Henry reiterated that when he first observed the defendant, he “was just leaning into” the SUV. Although he observed no interaction between the defendant and anyone in the SUV, when the SUV “sped off” within “several seconds” of observing the police unit, Officer Henry and his partner, rather than pursuing the SUV or obtaining its license plate number, ordered the defendant to stop as he got on his bicycle and started to ride off. According to Officer Henry, upon being asked to stop, the defendant did so with no argument or threatening gesture. Moreover, Officer Henry stated that he observed no lumps in the defendant’s waistband or weapons visible on his person, that the defendant was not holding up his pants as if trying to conceal a gun, and that the defendant did not reach for anything. Nonetheless, after complying with |7the request to stop, the defendant was immediately told to put his hands on the police car and patted down by Officer Goines. According to Officer Henry, his partner discovered marijuana in the defendant’s shoe during the pat-down and, subsequently, during the search incident to the defendant’s arrest for possession of marijuana, found several loose pieces of cocaine in the defendant’s hat and his right front coin pocket.
*127 Officer Goines also testified at the motion hearing, relating that he and his partner, accompanied by two other marked police units, were on proactive patrol in the area around Seventh and Danneel Streets “which is known as [a] high crime, drugs and gun area.” At approximately noon, as the police unit arrived at the corner of Seventh and Danneel Streets, Officer Goines observed a black male (the defendant) who was unknown to him leaning into the window of a SUV. The SUV immediately “sped off’ and the defendant “got on his bicycle and went east on Dan-neel, going against traffic on the sidewalk.” Accordingly, Officer Goines, elected to “conduct a suspicious person stop” of the cyclist.
I told Mr. Butler to stop where he was at, and [sic] which he fully complied. I told him to put his hands in the air, [sic] which again he fully complied.
We relocated to the police vehicle, patted him down for officer safety. When I pat someone down, I usually raise their pants up because their pants sag, so I patted down his left leg. I looked down and I seen [sic] a bag of marijuana resting on his left side of his shoe, on the lip of the shoe, next to his ankle, on his white sock.
After finding the marijuana, Officer Goines advised the defendant of his Miranda rights and, upon checking the defendant’s hat and coin pocket, retrieved several rocks of cocaine. After being again being advised of his Miranda rights, the defendant made the statement to Officer Goines that he had “messed up his day, he was going home and get high.”
|80n cross-examination, Officer Goines conceded he did not see the marijuana until he raised up the defendants pants at the waist with his finger. He also conceded that, although he was only six feet away from the defendant when he first observed him leaning into the SUV, he did not see any interchange between the defendant and any occupant of the SUV. In addition, Officer Goines admitted that that he did not see the defendant holding any weapons, holding his waistband as if he had a weapon, or make any threatening gesture.
Officer Goines also testified at trial. He stated once again that he and the other police officers were on pro-active patrol when he observed the defendant leaning in the window of a black SUV, that it was noon,[1] and there was nothing to obstruct his view of the defendant. According to Officer Goines’ trial testimony, when he “first observed the officers, Mr. Butler actually looked over his left should and looked kinda startled.” Next, the defendant “then, at that time, got on his bicycle going against traffic headed east on the sidewalk.” Officer Goines revealed that several other people who were standing on the street when the three patrol cars drove up went into the corner store as the SUV “sped off.” Then Officer Goines exited his vehicle and “went to go and get Mr. Butler to stop from fleeing the scene,” while the other officers went into the store.
Q. And did he stop?
A. He stopped.
Q. And what happened next?
A. Well, I instructed Mr. Mr. Butler to stop, in which he fully complied. I relocated him to the police vehicle and conducted a pat down.
Q: And is that, um, like a normal thing that you would do a pat down?
*128 A. Yes, ma’am, for officers’ safety.
|9Q. Okay, And how does that pat down work exactly?
A. On a normal day — well, the individuals in that general area usually wear their pants below the buttocks, so we usually raise their pants up above their, their waist so we get a better feel off the person. And upon me patting down Mr. Butler in his crotch area and along his pockets, I went all the way down his leg, and when I went down his left leg, that’s when I seen [sic] the little bag of marijuana on the left — in his left shoe, resting upon hi — the left lip of the white sock of his shoe.
Subsequently, Officer Goines identified the small bag of marijuana and five pieces of rock cocaine that he retrieved from the defendant and John F. Palm, Jr., criminalist for the NOPD and expert in the testing of narcotics, testified that the materials tested positive, respectively, for marijuana and cocaine.
Thus, according to the explicit testimony of the police officers, they exited their police car, ordered the defendant to stop and put his hands on the police vehicle to be patted down. There is no evidence that the defendant was involved in any suspicious or illegal activity prior to the pat-down. In fact, the police officers specifically testified that they had a clear view of the defendant from a short distance and saw no interchange between the defendant and the occupants of the vehicle. Thus, the record before us bears no indicia of any particularized suspicion that this defendant was involved with drugs or drug transactions except for the rationale underlying the proactive patrol, ie. the area around Danneel and Seventh Streets is considered (like many areas of New Orleans) a high crime area.
Thus, this case appears to exemplify the concern expressed by the Justice Department (and ultimately conceded by the city in the Consent Decree) pertaining to inadequate training of NOPD officers with regard to the constitutional |inparameters of search and seizure. See United States Department of Justice, Investigation of the New Orleans Police Department (3/16/2011), pp. 30-31 (NOPD’s lack of adequate policy and training regarding search and seizure have left officers without basic foundation to perform their duties within constitutional boundaries).
Detective Goines specifically testified that he had no prior knowledge of the defendant and both officers stated they saw no interaction or exchange between the defendant and the occupants of the SUV. Thus, while in some circumstances a cyclist leaning against an SUV in a high crime neighborhood might suggest a drug transaction, therefore making it reasonable for an approaching officer to fear for his safety in approaching the cyclist, there is nothing in this record to support such a finding. We are a court of record and cannot impute a rationale into the record over the clear statements of the testifying officers that provide absolutely no indication of a particularized suspicion to support the patdown of this defendant. See Investigation, supra, (Justice Department review of arrest reports to determine whether officers articulated sufficient facts to justify arrests, searches, or pat down, revealed serious gaps in police officers’ knowledge and ability to properly perceive and articulate reasonable suspicion and probable cause). Specifically, both officers conceded that the defendant was unknown to them and that their view of him (and his hands) was unobstructed in clear daylight. Neither officer voiced a concern, based on their experience or the neighborhood, that the defendant was involved in an illegal *129 activity.[2] Because no reasonable person ordered to stop and put his hands on a police unit to be patted down could have believed that he was free to |nleave, it appears that he was arrested without probable cause. See Fisher, supra (an arrest is taking of person into custody through actual restraint or submission or the person arrested; the determination of whether an arrest has occurred is objective and neither the person’s subjective impression or lack of formality of arrest resolves the issue). Accordingly, because the defendant was arrested without probable cause, the trial court erred in denying his motion to suppress.
Alternatively, accepting arguendo that this was a Terry stop and not an arrest, the next question is whether the police officer had an objectively reasonable suspicion, supported by specific and articu-lable facts, that the defendant was, or was about to be, engaged in criminal activity. Again, according to the officers’ testimony, they were on proactive patrol when they drove up to the corner of Seventh and Danneel Streets, accompanied by two other marked police units. Despite the fact that they had an unobstructed view of the defendant in the broad daylight from a distance of six or seven feet, they observed no suspicious exchange between the defendant and the occupants of the SUV.[3] Notably, the SUV “fled” upon the arrival of the police but the defendant merely got on his bicycle and started to ride away. There is absolutely no testimony that the defendant attempted to leave the scene in a hurried manner. At trial, Officer Goines testified that the defendant looked “kinda startled,” but under the totality of the circumstances — where a phalanx of police cars suddenly arrived and the SUV vehicle (with the occupants whom the defendant was apparently engaged in conversation) suddenly | ia“fled” — there is nothing inherently suspicious in looking “kinda startled” which would be the normal reaction of most people seeing the approach of three marked police cars. Clearly, looking “kinda startled” in these circumstances does not constitute a specific and articulable fact that the person is engaged in, or about to be engaged in, criminal activity.[4] Thus, although an individual’s presence in high-crime area coupled with nervousness, startled behavior, flight or suspicious actions upon approach of officers has been found to be reasonable suspicion for investigatory stop, State v. Seltzer, 08-34, p. 8 (La.App. 5 Cir. 5/27/08), 986 So.2d 762, 767, the totality of the circumstances in this case do not support that conclusion. Accordingly, we do not find that the police actions in this case can be properly characterized as a Terry stop and, thus, constitutionally acceptable.
Finally, even if the validity of the investigatory stop were upheld, the *130 reasonableness of the patdown and the subsequent discovery of the drugs remains problematic. The reasonableness of a frisk conducted as part of a lawful investigatory stop is governed by an objective standard. Accordingly, the issue is not whether the police officer subjectively believed (or articulated a subjective belief at the motion hearing or trial) that he was in danger, but whether “a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger.” State v. Boyer, 07-0476, p. 20 (La.10/16/07), 967 So.2d 458, 471 (citations omitted). The officers in this case vaguely referenced “officer safety” but articulated no basis for the patdown of the defendant. The officers did not recognize the defendant as a person with a criminal history and did not articulate any particular reason why they believed he might be | ^inclined to assault them. Notably, there is nothing in their testimony to indicate that the defendant had his hands closed or in his pockets and the natural assumption is that someone riding has his hands on the handlebars in plain view. Moreover, the defendant apparently made no gestures or action indicative of an intention to assault the police officers. Rather, according to the officers’s testimony, the defendant quickly and unquestioningly complied with the officer’s request to stop and, further, to place his hands on the police vehicle. Thus, there appear to be no facts to support a finding that the police had a reasonable, objective and particularized basis for conducting a patdown of the defendant.
Moreover, even accepting ar-guendo that being in a reputedly high crime area of the city is enough to justify a frisk of any individual stopped for questioning by the police, the issue remains as to whether the seizure of the evidence from the defendant’s sock was constitutional. If an officer feels a nonthreatening object during a valid Terry patdown whose contour or mass makes its identity as contraband immediately apparent, it may be lawfully seized pursuant to the plain view doctrine because there has been no invasion of privacy beyond that already authorized by the officer’s search for weapons. Boyer, 07-0476, p. 22, 967 So.2d at 472 (citations omitted). That, however, is not the testimony in this case. Officer Goines did not discover the contraband in the defendant’s sock as a result of the patdown but, rather, saw it as a result of pulling up his pants at the waistband. Research reveals no caselaw wherein lifting up an individual’s pants constitutes part of a valid frisk and, as noted in Boyer, the U.S. Supreme Court “has been sensitive to the danger ... that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.” Id. p. 23, 967 So.2d at 472 (citing Minnesota v. Dickerson, 508 U.S. 366, 378, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). Thus, even if we find that the patdown of the defendant was constitutionally valid, the incriminating evidence was not apparent to Officer Goines during the patdown. Rather, only after pulling up the defendant’s pants — an action not authorized by Terry or any other exception to the warrant requirement that we have found — did the contraband come into view and, as such, is not valid pursuant to the plain view doctrine.

Conclusion

The police actions and testimony in this case exemplify concerns expressed by the Justice Department, and conceded by the City, as to whether officers of the New Orleans Police Department have been adequately trained regarding the constitutional boundaries of search and seizure. See United States Department Of Justice, In *131 vestigation of the New Orleans Police Department (3/16/2011), pp. 30-31; see also United States of America v. The City of New Orleans, 2:12-01924 (E.D.La.7/24/12), pp. 12, 38-44. Thus, the trial court clearly-erred in denying the defendant’s motion to suppress the evidence and statement. Accordingly, the defendant’s conviction is vacated and the matter is remanded back to the trial court. Although our review of the record reveals two errors patent pertaining to the defendant’s sentencing, because we reverse the judgment of the trial court and vacate the defendant’s conviction, we pretermit discussion of those errors.
JUDGMENT REVERSED; CONVICTION VACATED; REMANDED.

. Officer Goines testified that he was unable to see any of the occupants of the SUV because the windows of the vehicle had an illegal "limo” tint.

. Notably, the State argues in its appellate brief that the defendant was riding on the sidewalk and against traffic in violation of a municipal ordinance, but the police officers did not offer this as a rationale for stopping and detaining the defendant. This court does not consider issues raised for the first time on appeal.

. Although an experienced police officer's observation of hand movements consistent with a drug transaction, even if he cannot observe what was exchanged, may provide "the requisite minimal objective basis for an investigatory stop.” State v. Pratt, 2008-1819, p. 2 (La.9/4/09), 16 So.3d 1163, 1165. In this case Officer Goines specifically stated that he had an unobstructed view of the defendant leaning on the SUV but saw no interchange or hand movements of any sort with an occupant of the vehicle.

.Frankly, it would be more remarkable if a person did not flee upon the sudden appearance of three marked police cars in a high crime neighborhood.