**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1214n.06

**No. 11-6394**

<table>
<tr><td>UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT</td><td>**FILED**<br>*Nov 26, 2012*<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) ON APPEAL FROM THE UNITED |
| v. | ) STATES DISTRICT COURT FOR THE |
| | ) WESTERN DISTRICT OF TENNESSEE |
| MARIO HAYWOOD, | ) |
| | ) |
| Defendant-Appellant. | ) |

Before: COOK and WHITE, Circuit Judges; SHARP, District Judge.[*]

COOK, Circuit Judge.  Mario Haywood, who pled guilty to possessing more than five hundred grams of cocaine with intent to distribute, appeals the district court's denial of his motion to suppress evidence.  Alternatively, he challenges the reasonableness of his 87-month sentence. Though we disagree with some of the district court's legal conclusions, we AFFIRM its judgments for the following reasons.

I.

In March 2009, the Memphis Police Department Organized Crime Unit received a tip from a confidential informant that Mario Haywood sold cocaine and other drugs from his grandfather's house located on Dwight Road.  This informant, whose cooperation with the police previously led

_____

*The Honorable Kevin H. Sharp, United States District Judge for the Middle District of Tennessee, sitting by designation.

to two felony-drug arrests and five drug seizures, described Haywood as a "male black [with] dark complexion, five-six to five-eight in height, 30 to 35 years of age, [and] 160 to 170 [pounds]." The informant also provided the license plate number of Haywood's Bonneville.

From this information, Detective Mario McNeal dispatched a team of detectives to watch the Dwight Road residence while he sought a search warrant. Detective Willard Tate, the first to arrive, parked his car a block away and positioned it so that he could observe the front porch and the inside of the Bonneville through his front windshield using binoculars. Tate radioed his observations to other detectives waiting around the corner.

Over the next hour or so, Tate observed Haywood walk from the front porch to the Bonneville at least three times. Each time, Haywood sat inside the car with several other men. Although Tate could not actually see distinct dollar bills or drugs exchanged, he thought their gestures suggested drug transactions.

Following these transactions, a Malibu driven by Roshina Holloway pulled up to the residence. Haywood approached the Malibu with a gun in hand, passed the gun to Holloway, and then sat in the passenger side. Alarmed that Haywood was about to leave the residence, Tate radioed his team to report what he saw.

Holloway started driving toward Tate, who then exited his vehicle, identified himself as a police officer, and asked Holloway to stop. Though Tate wore plain clothes, he put on a police vest

as he was exiting.  The Malibu slowed down, and two other detectives pulled up behind it in a marked police car.  Haywood suddenly got out of the Malibu and fled on foot until the detectives eventually arrested him following a chase.

Following this arrest, the detectives searched Haywood's pockets, discovering drugs and $4,659.  They handcuffed Haywood, placed him in the backseat of the police car, and waited for the search warrant to arrive.  McNeal procured the search warrant at 6:30 p.m. and immediately brought it to the scene.  The detectives then searched the Bonneville, discovering more drugs and cash.  Once at the police station, Haywood admitted ownership of the items seized during the search.

During the suppression hearing, Haywood disputed the officers' account of what happened.  According to Haywood, he arrived at his grandfather's house around 5:00 p.m. but never left the porch to sit in the Bonneville.  He neither traded drugs, nor carried a gun.  And when he and Holloway left in the Malibu to purchase beer, a black car "swooped" in front of them, blocking the Malibu.  He then jumped out of the car and ran until the detectives subdued him.  The detectives then searched him upon arrest and, before any search warrant arrived, searched his Bonneville.  Haywood maintains that he did not know Tate was a police officer, though he admits seeing the police enter his grandfather's house during the chase.

The district court credited the detectives, who corroborated each other's testimony. The court found the search of Haywood's person a lawful patdown authorized by *Terry v. Ohio*, 392 U.S. 1

(1968). The court also found that the automobile exception authorized the detectives to search

Haywood's Bonneville even in the absence of a search warrant.[1] This timely appeal followed.

II.

A. Motion to Suppress Evidence

Haywood contends that the detectives had neither reasonable suspicion to pat him down nor

probable cause to arrest him, rendering the searches unreasonable. As support, he attacks the district

court's factual determinations, stressing the inconsistencies among the detectives' testimony. For

example, Tate stated that Haywood carried the gun at his side to the Malibu, but the arrest ticket

notes that Haywood pulled the gun from his waistband before handing it to Holloway. Tate also

testified that he decided to stop the Malibu, whereas McNeal recalled ordering the detectives to stop

the Malibu via radio. Finally, Tate stated that the Malibu slowed down when he asked Holloway to

stop; in contrast, McNeal testified that the Malibu sped away for a few blocks after Tate's demand.

These discrepancies do not leave us with "the definite and firm conviction that a mistake has

been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (citations

omitted). They do not change the material facts: that Haywood carried a gun and ran from the

detectives. We thus find no clear error arising from the differences between the officers' testimony.

---

[1]The court declined to decide whether the automobile search occurred before or after McNeal obtained a signed search warrant. In another part of the order, however, the court credited McNeal's testimony that the search did not occur until his arrival with a signed search warrant.

*See United States v. Foster*, 376 F.3d 577, 583–84 (6th Cir. 2004) (no clear error where unresolved inconsistencies do not materially alter the facts); *United States v. Brown*, 20 F. App'x 387, 388–89 (6th Cir. 2001) (same); *see also United States v. Sweeney*, 402 F. App'x 37, 42 (6th Cir. 2010) (individual inconsistencies need not be resolved where the district court offers adequate explanations for factual findings).

Haywood also questions Tate's credibility, maintaining that Tate could not have observed the inside of the Bonneville because he sat a block away observing through tinted windows. He also highlights Tate's inability to recall the exact number of drug transactions he observed. Absent contradiction by extrinsic evidence or internal inconsistency, however, "[t]here can virtually never be clear error" when the trial judge premises his findings on the credibility of a witness who offers a coherent and plausible story. *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) (internal quotation marks omitted) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). Here, Tate explained that he looked through the windshield and used binoculars to observe Haywood inside the Bonneville.

In a similar vein, Haywood argues that Tate engaged in selective perception. Seizing on Tate's testimony that he wanted to see "some kind of action," Haywood contends that Tate's cognitive bias caused him to interpret innocent behaviors as criminal activities. The magistrate judge, however, heard and rejected this cognitive-bias argument before finding Tate credible, and the district court adopted this recommendation. A trial judge is better fit to evaluate the reliability

of Tate's testimony. *See Anderson*, 470 U.S. at 574 ("The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.").

Though the district court committed no clear error, we disagree with its legal conclusion that the *Terry* stop authorized the search of Haywood's person. *See United States v. Yoon*, 398 F.3d 802, 805 (6th Cir. 2005) (appellate courts review de novo district courts' legal conclusions). A *Terry* stop allows officers only to frisk a person for the safety and protection of officers; it does not permit a full search for evidence of criminal activity. *See Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) ("[T]he officer's continued exploration of [defendant's] pocket after having concluded that it contained no weapon was unrelated to . . . the protection of the police officer and others nearby . . . therefore amount[ing] to the sort of evidentiary search that *Terry* expressly refused to authorize . . . ." (internal citations and quotation marks omitted)). An officer can justifiably seize drugs and cash only if their incriminating character is immediately apparent during the *Terry* patdown. *See id.* at 379. Here, no testimony or evidence supports the view that detectives plainly recognized the presence of the drugs and cash upon placing their hands over Haywood's pockets.

Unlike a *Terry* stop, however, a lawful arrest authorizes officers to search and seize destructible evidence in defendant's pockets. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009) (search incident to arrest justifies "safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy" (citation omitted)); *Chimel v. California*, 395 U.S. 752, 763 (1969) ("[I]t is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's

person in order to prevent its concealment or destruction."), *abrogated on other ground by New York v. Belton*, 453 U.S. 454 (1981). The lawful arrest validates the search of Haywood's pockets in this case.

Though Haywood's flight alone was not a crime, *see* Tenn. Code Ann. §§ 39-16-602(a) (obstruction of law enforcement requires use of force rather than mere flight); 39-16-603(a) (evading arrest requires knowledge that an officer is attempting arrest), when other detectives from the marked police car reached Haywood, he knew that his pursuers were police officers, and yet forcibly attempted to break free, thereby committing a crime in their presence. *See* Tenn. Code Ann. § 39-16-602(a) ("It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.").[2] We note that Tennessee law prohibits Haywood's conduct even if the detectives unlawfully stopped him. *See* Tenn. Code Ann. § 39-16-602(b) ("[I]t is no defense to prosecution . . . that the stop, frisk, halt, arrest or search was unlawful."). Thus, even under Haywood's version of events, the outcome is the same. *See United States v. Castillo*, 238 F.3d 424 (6th Cir. 2000) (table); *United States v. Jefferson*, 182 F.3d 919 (6th Cir. 1999) (table).

---

[2]The detectives did not "stop" Haywood until they apprehended him after chase. *See California v. Hodari D.*, 499 U.S. 621, 625–26 (1991) (no seizure of fleeing defendant until apprehension).

Following Haywood's lawful arrest, the detectives properly searched Haywood's pockets. It matters not that the search would not have provided further evidence of Haywood's crime—resisting officers. *See United States v. Robinson*, 414 U.S. 218, 236–37 (1973) (upholding search incident to lawful arrest even though search would have produced no further evidence of driving with revoked permit). Once the detectives discovered drugs and cash in Haywood's pockets, they had the requisite probable cause to search the Bonneville in light of Tate's observations prior to the arrest. *Cf. United States v. Southard*, 20 F. App'x 304, 307 (6th Cir. 2001) ("Once [the arresting officer] lawfully discovered and seized the [contraband in defendant's] pocket . . . the automobile was subject to search incident to a lawful arrest." (citations omitted)). Because we agree with the district court that the automobile exception authorized the search of the Bonneville, we need not address Haywood's remaining arguments regarding when that search occurred. We affirm the court's denial of Haywood's motion to suppress evidence.

B. Reasonableness of Sentence

Alternatively, Haywood challenges the reasonableness of his sentence, arguing that the court failed to consider his individual characteristics. The record belies this claim. The court painstakingly considered Haywood's early criminal history, early education, adult criminal history, gang membership, physical ailments, history of alcoholism, IQ, prospective employment, and compliance under supervision. Haywood also received "a little bit of plus point" for his family members' service in the United States armed forces. We thus find Haywood's sentence reasonable.

III.


We AFFIRM.